Filed 10/12/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>DARRELL BOOTH,<br><br>    Defendant and Appellant. | G047986<br><br>(Super. Ct. No. 11CF1262)<br><br>O P I N I O N |
| In re DARRELL BOOTH<br><br>    on Habeas Corpus. | G052666 |

Appeal and original proceeding on a petition for a writ of habeas corpus after a judgment from the Superior Court of Orange County, Daniel J. Didier (retired judge of the Orange County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and David A. Hoffer, Judges. Petition granted, judgment reversed, and remanded for a new trial. Appeal dismissed as moot.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Meagan J. Beale and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

*　　　*　　　*

## I.  INTRODUCTION

This case arises out of a deadly shooting that took place in 1992.  Although several suspects were identified in the wake of the shooting, the case was not prosecuted until 2011.  By that time, an eyewitness who had exonerated petitioner Darrell Booth could not be found, and the case proceeded to trial in his absence.  Even without this favorable defense witness, the jury acquitted Booth of first degree murder.  It did, however, find Booth guilty of second degree murder, for which he received an indeterminate life sentence.  In this consolidated proceeding, Booth challenges his conviction by direct appeal and petition for writ of habeas corpus.  Among the claims in his habeas petition, Booth contends his trial attorney was ineffective for failing to move to dismiss the case based on precharging delay.  We agree with this contention.  Therefore, we grant Booth's petition, reverse the judgment and remand the matter for a new trial.  In light of this disposition, Booth's appeal is moot.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Shooting*

On August 1, 1992, at approximately 1:30 a.m., Stephen Strong drove a red SUV into the parking lot of the 7-Eleven at the corner of 17th Street and Spurgeon in Santa Ana.  He was accompanied by his cousins Scottie Strong and Terry Ross.  After Stephen backed the SUV into a parking space, Scottie entered the store.  Then four black men entered the parking lot on foot.  One of the men contacted Stephen, who was sitting in the driver's seat of the SUV.  Words were exchanged, and a volley of gunshots rang out.

2

Following the shooting, the four assailants ran to a white Ford Thunderbird parked nearby and made a successful getaway. The police arrived minutes later to find Stephen lying on the ground near the driver's door of the SUV and Ross slumped in the backseat. Both men were suffering from gunshot wounds to the chest and abdomen. Stephen was conscious and survived the shooting, but Ross died a short time later at the hospital. Investigators found several shell casings from a nine millimeter semiautomatic handgun at the scene.

B. *The Initial Investigation*

1. *Witness Statements*

There were several people in the vicinity of the 7-Eleven when the shooting occurred, but most of them were unable to provide any useful information about the identity of the assailants. The one exception was 17-year-old Charles Honea, who turned out to be an important witness for the state. Honea lived in an apartment complex a block away from the 7-Eleven. About 30 minutes after the shooting, he contacted a police officer at the scene and told him he had been sleeping on the balcony of his second-story apartment when he heard several gunshots. Honea said he looked around from his balcony and saw a young black man with braided hair in an alley nearby. The man was running away from the 7-Eleven toward Honea's apartment. A white car, which Honea described as a late model Mercury Cougar, pulled up to the man and someone inside the vehicle told him to get in, which he did. Then the car left the area. Honea reported he did not see the driver of the car at all, and he did not clearly see the man who entered the car.

Later that morning, the police spoke with Scottie Strong at the hospital. Scottie said he had no information about the shooting. But when the police interviewed him later that day, he was more forthcoming. He stated he was inside the 7-Eleven when the shooting took place. When the smoke cleared, he went outside and saw Stephen lying wounded in the parking lot. Stephen said "they shot us," but he did not mention any

3

names.  Later though, when Scottie spoke to Stephen at the hospital, Stephen said "Spade" had shot him.  Scottie told the police Spade was Michael Haslip.  He also said he knew Haslip, and it was hard for him to believe Haslip would ever want to shoot Stephen.

The next day, the police interviewed Stephen in his hospital room.  He denied knowing who shot him and denied telling Scottie that Haslip was the shooter.  However, the police continued to receive information that Haslip was involved in the shooting.  There were also numerous reports that Haslip's brother Tommy, who was also known as "Lamont" and "Unknown," took part in the shooting.

As the investigation unfolded, the police learned Mike Adray and Ellis Bradford might have information about the shooting.  Adray operated an electronics business in Orange, and Bradford was a security guard for the business.  On August 10, 1992, the police interviewed Adray and Bradford separately.  Both interviews were recorded, and both interviews are included in the record before us.  Because the interviews are highly relevant to the issues presented in this proceeding, we will recite them in considerable detail.

In his interview, Adray said he spoke to Bradford at his business on Monday, August 3, two days after the shooting.  Bradford told him some of his friends had been shot over the weekend.  Explaining what occurred, Bradford said he was driving along 17th Street early Saturday morning when he noticed a group of his friends outside Norm's Restaurant, near the 7-Eleven.  Bradford drove up to the group and offered to give them a ride home, and three of the men got into his car.  They then drove to the 7-Eleven, and Bradford and one of the men went inside to buy some drinks.  While they were in the store, gunfire erupted in the parking lot.  Bradford opened the front door of the 7-Eleven and saw several people shooting toward his car.  Then one of the shooters turned and aimed his gun at Bradford, prompting him to duck back inside the store for cover.  Bradford heard the sound of glass breaking and thought shots were being fired at him.  Once the gunfire stopped, he went outside and saw the shooters running away.  He

4

also realized the two friends in his car had been shot. When police arrived at the scene, they took Bradford into custody and questioned him for several hours before finally releasing him.

Adray further told the police that, after hearing this story from Bradford, he learned from one of his employees that Bradford never actually spoke to the police and that the shooting did not take place the way Bradford had explained it to him. Adray thus urged Bradford to go to the police and tell them what really happened. Bradford told Adray he was very nervous about the situation. He said the surviving victims knew who the shooters were, and they were not interested in seeking justice through the police and courts. Instead, they and their friends were bent on exacting revenge themselves and had already carried out several retaliatory shootings since the 7-Eleven incident took place. Bradford also said the people seeking revenge had shot "one of their own" because that person had intimated he was going to tell the police about the revenge shootings.

After talking to Adray, the police interviewed Bradford, who told them a very different story from the one he allegedly told Adray. For starters, Bradford said he did not give anyone a ride to the 7-Eleven on the night in question. Rather, he happened to be passing by the store on the way home from a club when he saw his friends Stephen and Scottie Strong in an SUV in the parking lot. Wanting to see what they were up to, Bradford made a u-turn on 17th Street and drove back toward the store. Just as he was about to enter the parking lot of the 7-Eleven, he heard a barrage of gunfire and saw four black men near the Strongs' vehicle. When the shooting stopped, the men scampered to a large white car on Spurgeon Street and made their getaway in the vehicle.

Bradford did not recognize the getaway car, but he did recognize the four assailants as "Lamont," "Demetri," "Deb" and "Peewee." He told the police he was sure these were the men he saw in the parking lot. He also provided a detailed description of the men. Bradford claimed he had seen them around Santa Ana on multiple occasions in

5

the past, but he did know what their real names were or if they still lived in the area. He had heard the men were living in Riverside and that Deb was planning to go to Texas.

Describing the shooting, Bradford said it looked like Demetri and Peewee were both firing shots at the driver's side of the Strongs' SUV. Demetri was closest to the vehicle and appeared to say something to Stephen after he was shot. Bradford also claimed that once he saw all the commotion at the 7-Eleven, he decided not to go into the parking lot and went straight home instead. Thus, as far as he knew, no one was aware he had witnessed the shooting.

Later that day, around noon, Bradford learned Stephen and Ross had been shot and that Ross was dead. Bradford went over to the Strong residence to pay his respects. When he got there, Scottie told him Stephen knew who the shooters were, but Scottie did not divulge their names to Bradford. Nor did Bradford tell Scottie he had seen the shooting. Bradford kept that information to himself because Scottie and Stephen were associated with the Crips gang, and the shooters were believed to be from the Bloods gang. Bradford knew the Crips and Bloods were mortal enemies and that members of the Crips had already been attacking Bloods in retaliation for the 7-Eleven shooting. Bradford did not want to get involved. He feared his life would be in danger if he told anyone what he had seen.

The investigators who spoke to Bradford told him they understood his situation, but they wanted to know why his version of events differed so greatly from what he allegedly told Adray. Bradford said there were lots of rumors flying around his workplace following the shooting. Adray approached him and wanted to know if it was true that he was inside the 7-Eleven when the shooting occurred and that he almost got shot. Bradford assumed Adray heard this story from other workers. (In fact, during his police interview, Adray acknowledged he had talked to other people besides Bradford about the shooting.) Fearful of getting fired, Bradford told Adray he knew nothing about the shooting. But Adray kept pressing him and wanted to know whether he was with the

6

victims when they were shot. Bradford said he was "close by," which Adray took to mean inside the 7-Eleven. However, according to Bradford, that was not the case. Rather, as recounted above, he was actually outside the parking lot when the shooting took place.

On August 13, 1992, three days after Adray and Bradford were interviewed, the police spoke to Stephen Strong at his home in Santa Ana. Stephen said the 7-Eleven shooting was precipitated by an incident that occurred at a liquor store several hours earlier. He, Scottie, and Terry Ross were at the liquor store with several of their friends when a maroon Cadillac pulled into the parking lot. Demetri, one of four black men in the Cadillac, confronted Stephen's group and started fighting with a guy named Charles. Then Demetri's companion Michael "Spade" Haslip pulled out a handgun, and someone in Stephen's group struck Spade in the head with a bottle. After that, the crowd dispersed and the two groups went their separate ways.

Stephen's group drove to a party in San Clemente and stayed there until about 1:00 a.m. They then drove to Norm's Restaurant in Santa Ana, but not much was happening there, so they decided to call it a night. Before doing so, they stopped at the nearby 7-Eleven to get something to eat. While Scottie was in the store, a young black man approached Stephen, who was sitting in the driver's seat of his SUV. At first, Stephen thought the man was Spade, but then he realized it was Spade's brother, Tommy "Lamont" Haslip. When Stephen rolled down his window to see what he wanted, Tommy said "you guys hit my cousin." Then Tommy punched Stephen in the face and several shots rang out. Stephen was shot in the stomach, but he did not know where the shots were coming from. As he lay wounded, he heard several more shots before seeing Tommy and others running toward Spurgeon Street. Stephen told the police he knew Tommy from their school days, and he identified the men who were with Tommy as "Demetri," "Deb" and "Peewee."

7

Investigators determined "Demetri" was Demetrius Lopez and "Deb" and "Peewee" were brothers Terrance and Lemaine Timms. All three men, along with Tommy "Lamont" Haslip, had connections to the Bloods gang in Santa Ana. The police also confirmed that there had been a confrontation between the Bloods and the Crips at a liquor store before the 7-Eleven shooting and that Michael "Spade" Haslip, a member of the Bloods, was hit in the head with a bottle during the fracas.

Throughout this initial phase of the investigation, petitioner Booth was hardly mentioned. However, his name did come up as a possible source of the gun that was used in the shooting. In addition, Donnell English, who was in jail when the shooting occurred, told police that when he spoke to Tommy Haslip after the shooting, Tommy said Darrell "Bobi" Booth was with him when he (Tommy) shot Stephen Strong and Terry Ross.

2. *Photographic Evidence*

Based on the above information, the police compiled a 36-person photographic array that included the pictures of Booth, Lopez and the Timms brothers. They also assembled two six-person lineups that contained photos of Michael and Tommy Haslip. On September 4, 1992, 34 days after the shooting, the police showed the photos to Charles Honea. Honea said the photo of Booth looked like the man he had seen running in the alley near his apartment after the shooting. Honea was not sure Booth was actually the runner; all he could say was that of all the photos he was shown, Booth "most closely resemble[d]" the man he saw in the alley from his balcony.

The police also showed the photos to Stephen Strong. He was able to recognize "Spade" (Michael Haslip) and "Lamont" (Tommy Haslip), as well as "Demetri" (Demetrius Lopez) and "Deb" (Terrance Timms). However, Stephen did not identify Booth or implicate him in any way.

Next to see the photos was Ellis Bradford. When the police showed him the pictures, he said he was very nervous about identifying anyone. He studied Michael

8

Haslip's photograph for a long time before finally saying he looked like one of the men who was involved in the shooting. Asked if he knew this person's name, Bradford said he thought it was "Lamont." Bradford also said that two of the men pictured in the photographs resembled Demetri, but he was not sure whether they were actually him. As it turned out, these two men (Terry Jordan and Charles Boyette) were police fillers and had nothing to do with the shooting.

After receiving this information from Bradford, the police learned the name "Lamont" was used by several suspects in the case. So they recontacted Bradford and asked him about his identification of Lamont. Bradford said he believed the person he identified as Lamont was Tommy "Lamont" Haslip. However, as explained above, the person was actually Tommy's brother, Michael. Bradford acknowledged the mix-up and told the police the person he saw at the shooting scene was Tommy, not Michael.

At one point, the police also asked Bradford if he recognized any of the other men who were displayed in the photographs. Looking at Booth's picture, Bradford said that he knew him as Darrell "Bobi" Booth and that he was *not* one of the four men he had seen running in the 7-Eleven parking lot after the shooting. Bradford also said Booth, Peewee and Deb were all cousins. Looking at the photo of Lemaine Timms, Bradford identified him as "Peewee," saying he was one of the men who was involved in the shooting. And looking at the photo of Terrance Timms, Bradford said he had seen him in the company of the men who carried out the shooting, but he could not specifically recall when that was.

No arrests or charges resulted from the initial phase of the investigation. Instead, the case was shelved until 2009, which is when the Santa Ana Police Department (SAPD) received a grant to fund cold case homicide investigations. This fiscal infusion allowed investigators to take a second look at the 7-Eleven shooting.

9

C. *The Second Phase of the Investigation*

In December 2009, 17 years after the shooting, the police interviewed Michael Haslip in prison. At that time, Michael was serving a life sentence for an unrelated murder. Recalling the fight at the liquor store before the 7-Eleven shooting, Michael told investigators someone hit him over the head with a bottle, knocking him out. He also said Demetrius Lopez drove him to a hospital in Riverside for treatment, and he was at the hospital all night. Michael did not know where his brother Tommy was that evening.

Hoping to shed light on that issue, the police interviewed Tommy on April 20, 2010. At that time, Tommy was living in Arkansas with his family and no longer involved in gang activity. At the start of the interview, the police informed Tommy he was under arrest for murder in connection with the 7-Eleven shooting. They also told him they had already talked to his brother Michael about the shooting. Tommy knew this because, before the police even contacted him, Michael had alerted him to the fact that investigators had been asking him (Michael) questions about Tommy and Booth.

After waiving his Miranda rights, Tommy admitted he was a member of the Bloods when the shooting occurred. He also admitted the "CK" tattooed on his left arm stood for "Crip Killer." However, when the police told Tommy that people were implicating him as the gunman in the 7-Eleven shooting, he insisted he did not shoot Stephen Strong or Terry Ross. Tommy claimed that after he learned his brother Michael had been struck in the head with a bottle, he and three of his cousins – Booth, Lemaine Timms and Terrance Timms – immediately went to see Michael in the hospital. Michael told them Stephen Strong was present when the bottle incident occurred. Tommy knew Stephen was a Crip. Indeed, Tommy was personally familiar with Stephen because Stephen had shot him in the past.

According to Tommy, he left the hospital with Booth and the Timms brothers in a white Ford Thunderbird. As they were driving around, they talked about

10

how they were going to "get" Stephen if they ran into him. Sure enough, they spotted Stephen's vehicle in the parking lot of the 7-Eleven. After parking their car on Spurgeon Street, they walked into the parking lot and Tommy snuck up on Stephen, who was sitting in the driver's seat, and started punching him. At the time, Booth was standing toward the rear of Stephen's vehicle. It appeared to Tommy that Booth was firing a gun because there were muzzle flashes coming from his vicinity.

Tommy told police that although Booth always carried a gun and they had talked about "smoking" Stephen, he was surprised by the shooting. When he realized what was happening, he ran from the scene and was eventually picked up by his three companions in the Thunderbird. Then they drove to Riverside. On the way there, Booth still had the gun and implored everyone not to talk about what had happened.

Tommy also told the police that, following the shooting, he was arrested several times on unrelated matters before moving to Arkansas. However, on those occasions, the police never asked him about the 7-Eleven shooting. One time, an investigator did give Tommy his card and tell him he wanted to talk to him about the shooting. But that conversation never took place because when Tommy called the investigator, they could not agree on an interview site. The investigator wanted Tommy to come down to the police station, but Tommy refused to do so.

D. *Judicial Proceedings*

1. *The Charges and the Disposition of the Codefendants' Cases*

In August 2011, 19 years after the shooting, Booth and the Timms brothers were charged with first degree murder and acting for the benefit of a criminal street gang. The prosecution further alleged Booth personally used a firearm in murdering Ross. Tommy Haslip was also charged with murder in connection with the shooting. However, he pleaded guilty to manslaughter and received a mitigated sentence of 14 years in prison in exchange for testifying at Booth's trial. After Booth's trial was over, Terrance Timms also pleaded guilty to manslaughter, and he was sentenced to six years in prison. The

11

charges against Lemaine Timms were dropped altogether because at that time he was in extremely poor health and already serving time on an unrelated case.

2. *The Trial*

The evidentiary phase of Booth's trial lasted all of two days. Consistent with his pretrial interview, Tommy Haslip testified he, Booth and the Timms brothers were out to avenge the attack on his brother Michael when they spotted Stephen Strong at the 7-Eleven. Tommy told the jury he was unarmed at that time and only wanted to fight Stephen. However, after he and his pals parked their car on Spurgeon Street, Booth grabbed a handgun from the dashboard as they headed toward the 7-Eleven parking lot.

As they approached the driver's side of Stephen's vehicle, Tommy noticed a person in the back seat whom he did not recognize. He tapped on the driver's side window, and when Stephen lowered it, he punched him in the face. Then "bullets started flying," and Tommy made a run for it. He did not know who was shooting or where the shots were coming from. Nor did he know where his cohorts were at that time. However, all four of them made it back to their car at about the same time. When they reentered the vehicle, Booth still had the gun and told the others they had "better not say anything." They fled the area and drove to Riverside. Tommy testified that, other than Booth, he did not see anyone in his group with a gun that night.

Charles Honea testified he saw a black man with braided hair running in the alley near his apartment following the shooting. He said a white Thunderbird pulled up to the man, and someone yelled, "We got to get out of here." The man entered the car and it sped away. Although Honea could not identify Booth in court, he testified he was "quite certain" the man he saw in the alley was the same man he picked out of the photographs he viewed after the shooting in 1992, i.e., Booth. However, Honea also admitted that of all the men displayed in the photographs, Booth was the only one who had braided hair.

12

David Rondou, a corporal who was in charge of the SAPD's gang unit at the time of the shooting, testified about the general characteristics of criminal street gangs. In his opinion, the 7-Eleven shooting was representative of the animosity that existed between the Bloods and the Crips in the early 1990's. He surmised the murder would have elevated both the status of the Bloods who carried it out and the gang as a whole. He also stated the murder set off a wave of shootings between the Bloods and the Crips that resulted in multiple casualties.

In closing arguments, the prosecutor maintained Booth was guilty of first degree murder for personally shooting Ross with premeditation. Alternatively, the prosecutor argued Booth was guilty of that offense based on aiding and abetting principles. However, the jury acquitted Booth of murder one. It did find him guilty of murder in the second degree and that the murder was gang related, but it found the allegation he personally used a firearm not to be true.

3. *New Trial Motion*

Following the verdict, Booth fired his trial attorney, and Mitchell Haddad took over his case. Haddad filed a motion for a new trial based on newly discovered evidence and ineffective assistance of counsel. The newly discovered evidence consisted of statements and declarations from a variety of Booth's friends and relatives.[1] Under the heading of potential alibi evidence, Michael Haslip, Ronnie Ward and Booth's wife Arnetha all alleged that, on the night of the shooting, Booth was with them at the Riverside hospital where Michael was being treated. With respect to the shooting itself, Terrance Timms claimed that Booth was not with him and the other assailants when they carried out the shooting. Timms asserted Tommy Haslip was the triggerman, and following the shooting, they picked up Tommy in an alley before making their getaway.

---

[1] For purposes of the motion hearing, the parties agreed to accept the subject statements and declarations as true in lieu of presenting live testimony.

13

Haddad argued Booth would have received a more favorable verdict had this evidence been presented at trial. He also asserted trial counsel was ineffective for rushing the case to trial and not allowing his defense investigator Jose Dominguez to gather the necessary evidence to support an alibi defense. As part of the new trial motion, Dominguez filed a declaration explaining his work on the case. He alleged he told trial counsel he needed more time to investigate the shooting, but trial counsel answered ready for trial anyway.

During the motion hearing, Haddad also represented that Scottie Strong, whom Haddad had recently subpoenaed, would have been available to testify had trial counsel not rushed the case to trial. According to Haddad, Scottie would have testified that after the shooting, he ran up to Stephen and asked who shot him, and Stephen replied, "Unknown," which was one of Tommy Haslip's nicknames. Scottie was also prepared to testify that he knew Booth and that Booth was not among the group of men who carried out the shooting.

The trial court was not persuaded by Haddad's arguments. It surmised the alibi and exonerating evidence that was allegedly "newly" discovered was likely available at the time of trial. And even if the subject evidence had been admitted into evidence, it probably would not have affected the outcome of the case because all of the alibi and exonerating witnesses were either related to, or friends with, Booth. As for the ineffective assistance of counsel claim, the trial court was of the opinion that trial counsel represented Booth in a competent and skillful fashion, as evidenced by the fact the jury acquitted Booth of first degree murder and found the firearm allegation not true. Although Haddad argued Booth could have been acquitted outright if trial counsel had handled the case differently, the trial court denied the new trial motion and sentenced Booth to 15 years to life in prison.

14

4. *The Appeal and Original Habeas Petition*

Booth appealed, claiming the trial court erred in denying his motion for a new trial. He also argued the trial court's flight instruction was erroneous, and trial counsel was ineffective for not objecting to certain statements in Tommy Haslip's pretrial interview with the police.

In conjunction with his appeal, Booth filed a petition for a writ of habeas corpus alleging trial counsel was ineffective for 1) failing to move to dismiss the case due to precharging delay, 2) failing to more effectively cross-examine Honea about his pretrial identification of Booth, and 3) failing to investigate and produce certain alibi and exonerating evidence. Regarding the first claim, Booth alleged the 19-year delay that occurred between the time of the shooting and the time he was charged resulted in the loss of material witness Ellis Bradford, who, despite defense investigators' efforts, could not be located at the time of trial and whose whereabouts are still unknown to this day. After receiving an informal response to the petition, we issued an order to show cause returnable in the trial court and stayed the appeal. We also ordered the trial court to conduct an evidentiary hearing and make any necessary findings before ruling on the petition.

5. *Evidentiary Hearing and Ruling on the Habeas Petition*[2]

At the evidentiary hearing, trial counsel testified he contemplated putting on an alibi defense. However, there were holes in that defense so he decided to simply challenge the adequacy of the prosecution's evidence, which he felt was "weak." Trial counsel admitted he could have used more time to prepare for trial, but at the same time, he did not think his case was going to get any better if the trial were delayed. In his mind, the evidence necessary for an effective alibi defense was just not coming together, so there was no need to seek a continuance. Another factor in his decision to answer

---

[2] The evidentiary hearing was conducted by Judge David Hoffer due to the death of Judge Daniel Didier, who presided over Booth's trial.

15

ready for trial was that Booth feared his codefendants might follow Tommy Haslip's lead and turn against him in the hope of obtaining favorable treatment from the prosecution. However, trial counsel did not have any specific information to corroborate Booth's fear in this regard. And although Booth wanted to go to trial sooner rather than later, he did waive his right to be tried within sixty days of being arraigned on the information, which suggested he might be amenable to some delays.

Defending his decision not to call Scottie or Stephen Strong as witnesses at trial, trial counsel said they were both reluctant to testify, and forcing them to do so could have been worse than not calling them at all. Trial counsel felt he did a pretty good job cross-examining Honea. And although his investigators looked "high and low" for Bradford before trial, they were unable to locate him. Trial counsel believed Bradford was a very important witness for the defense. He thought about bringing a motion to dismiss based on the theory Bradford's unavailability violated Booth's right to a fair trial. However, for reasons he could not recall, trial counsel never made such a motion. As a matter of fact, trial counsel could not remember many of the details regarding his trial strategy or whether he ever discussed bringing a dismissal motion with Booth. All he could say was that he did what he thought was best to win the case.[3]

Deputy District Attorney Mark Geller was the prosecutor on Booth's case. Speaking to the issue of pretrial delay, he testified the SAPD has the busiest gang unit in the county. Thus, once a case goes cold, the department does not have a lot of time or resources to reexamine it. However the department received a grant around 2009 which allowed it to focus on unsolved homicides, including this one. After investigators

---

[3] In his prehearing declaration, trial counsel stated he did not consider making a dismissal motion "based specifically on the loss of the witness Ellis Bradford." Booth interprets this to mean trial counsel never considered making a motion based on Bradford's unavailability. However, at the evidentiary hearing, trial counsel explained that he did in fact have Bradford in mind when he contemplated making the motion. But the basis for the motion would not have been limited to Bradford's unavailability. Instead, it would have encompassed the loss of Bradford *and* the loss of any other evidence that may have resulted from the lengthy precharging delay that occurred.

interviewed Tommy Haslip in 2010, Geller was confident there was sufficient evidence to file charges against Booth. However, prior to that time, Geller felt "it was a skinny case," and there was not enough evidence to convict Booth.

Asked if Tommy Haslip was ever interviewed when the initial investigation took place back in 1992, Geller answered, "I don't know."[4] However, Geller said gang members generally do not like talking to the police because "that's frowned upon in the gang culture." It has been Geller's experience that when gang members are subpoenaed to testify in court, they will often lie on the witness stand or claim they do not remember the events in question.

At the evidentiary hearing, the People also presented evidence that Bradford, Michael Haslip, and Scottie and Stephen Strong all have criminal records. Michael, as mentioned, was serving a life sentence on an unrelated case at the time of Booth's trial, and Scottie and Stephen have extensive rap sheets. As for Bradford, the record shows he pleaded guilty to inflicting corporal injury on his spouse in 1998, and in 2004 he was convicted of perjury for submitting false information in connection with his application for a driver's license.

Despite Bradford's convictions, Haddad argued he was a credible and material witness who could have exonerated Booth had the case proceeded to trial in a timely fashion. Haddad further asserted that even though Tommy Haslip was a gang member when the shooting occurred in 1992 and *might* not have cooperated with investigators back then, the police should have at least made an effort to talk to him at that time since he was implicated in the murder by a variety of sources. Haddad maintained, "It just seems like there wasn't diligent investigation, and [the authorities] just kind of put this evidence on the back burner and forgot" about it until "20 years later

---

4      Geller did not start prosecuting gang cases until 2001.

17

[when they] . . . pick[ed it] up . . . and arrest[ed] the prime suspect (Tommy Haslip) and crack[ed] the case."

The prosecution argued it made sense for trial counsel not to bring a motion to dismiss based on precharging delay because such a motion would have delayed the trial even more and also signaled weakness in the defense case. The prosecution further asserted that a motion to dismiss would have been unsuccessful on its merits because Bradford had credibility problems, and the delay in charging was justifiable due to lack of investigative resources. The prosecutor even went so far as to say Bradford had the credibility "of a complete dirt bag" and that he lied to the police about having witnessed the shooting because it made him feel important.

After taking the matter under submission, the trial court issued a lengthy written ruling. It rejected as not "remotely convincing" the prosecution's assertion that there was a possible strategic justification for trial counsel's failure to bring a motion to dismiss based on precharging delay. (Trial Court's Ruling, p. 13.) In that regard, the court stated, "First, there is no reason for the motion to have delayed the proceedings. Although the trial occurred relatively quickly after charges were brought, the statutory time for a motion to dismiss was available. Second, even if trial counsel would not want to divulge the absence of witness Bradford, it seems clear he would do so if it could result in a dismissal of the case." (*Ibid*.) While the court had little difficulty with this issue, it found the question of whether a motion to dismiss would have been successful on the merits considerably more vexing.

On the one hand, the court felt Booth was "powerfully prejudiced by the loss of witness Bradford." (Trial Court's Ruling, p. 14.) Indeed, the court acknowledged Bradford could have provided evidence that "both directly inculpated all four of the suspects [i.e., Tommy Haslip, Demetrius Lopez and Terrance and Lemaine Timms] and specifically exculpated" Booth. (*Ibid*.) The court also recognized the prejudice from Bradford's unavailability was "enhanced by the weakness of the evidence against [Booth]

18

and the closeness of the trial." (*Id.*, p. 15.)  Given what it described as "the limitations of the evidence and the jury's implicit rejection of some of it," the court determined Bradford's absence "likely had a substantial impact on the jury's view of the case." (*Ibid.*)

On the other hand, the court felt Bradford's credibility would have been a potential problem for the defense because Bradford was a convicted felon and he had trouble identifying Michael and Tommy Haslip from the lineups he was shown shortly after the shooting.  The court was also concerned Bradford told the police a "wildly different story" from the one he allegedly told Mike Adray.  (Trial Court's Ruling, p. 16.) Skeptical of Bradford's claim he witnessed the shooting, the court surmised it was "far more likely [Bradford] put together the suspect list the next day when he admittedly visited the Strong residence while they were planning their retaliation." (*Id.*, p. 15.) Thus, even though the court felt Bradford's absence at trial was "extremely prejudicial" to the defense, it did not believe Bradford's presence would necessarily have changed the outcome of the case.

Moreover, the court felt the lack of investigative resources was a strong justification for the precharging delay that occurred.  It discerned no bad faith or negligence on the prosecution's behalf, and it dismissed Booth's claim the police could have obtained Tommy Haslip's cooperation earlier than they did as "pure speculation." (Trial Court's Ruling, p. 19.)

In sum, the court concluded, "Although the powerful prejudice from the absence of . . . exculpatory witness [Bradford] makes this case extraordinarily close, . . . the balance tips in favor of the justification and . . . had the trial judge faced the issue of pre-accusation delay, he would have denied a motion to dismiss." (Trial Court's Ruling, pp. 19-20.)  Therefore, the court ruled trial counsel was not ineffective for failing to bring such a motion.  The court also rejected Booth's alternative claims that trial counsel was ineffective for failing to impeach Honea more effectively and failing to investigate and

19

present evidence from the alleged alibi and exonerating witnesses.  It thus denied Booth's petition for a writ of habeas corpus.

## III.  DISCUSSION

In this habeas petition, Booth renews his claim that trial counsel was ineffective for, inter alia, failing to move to dismiss the case on the basis of precharging delay.  We agree this failure violated Booth's Sixth Amendment right to effective assistance of counsel.  Therefore, we will reverse the judgment and remand the matter for a new trial.

A.  *Applicable Legal Principles*

The right to counsel is enshrined in both the federal and state Constitutions. (U.S. Const., Sixth Amend.; Cal. Const., art. I, § 15.)  It entitles a criminal defendant to competent and effective representation at every critical stage of the case, including pretrial proceedings.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 615.)  Although the right to counsel is one of the most important elements of due process (*Powell v. Alabama* (1932) 287 U.S. 45, 68-69), courts must refrain from second-guessing defense counsel's tactical decisions in a given case.  (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)  Indeed, given "the variety of circumstances faced by defense counsel" and the "range of legitimate decisions regarding how best to represent a criminal defendant," judicial review of counsel's performance must be "highly deferential."  (*Ibid.*)  Nevertheless, because the right to counsel is "indispensible to the fair administration of our adversarial system of criminal justice" (*Maine v. Moulton* (1985) 474 U.S. 159, 168-169), we must never shrink from our responsibility to carefully review claims involving alleged violations of that right.  (*People v. Centeno* (2014) 60 Cal.4th 659, 663 ["deference to counsel's performance is not the same as abdication"].)

Our review is guided by a two-part test.  "'"'[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness

20

. . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" [Citations.]' [Citation.] This second part of the . . . test 'is not solely one of outcome determination. Instead, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." [Citation.]' [Citation.]" (*In re Hardy* (2007) 41 Cal.4th 977, 1018-1019.)

With this test in mind, we now turn to the law governing prosecutorial delay. We recognize at the outset that the primary safeguards against such delay – statutes of limitation and the constitutional guarantee of a speedy trial – are not at issue in this case because there is no statute of limitations for murder (Pen. Code, § 799), and the speedy trial right is not triggered until the defendant is formally charged or arrested (*United States v. Marion* (1971) 404 U.S. 307, 320). However, the due process clause of the Fifth Amendment also has a "role to play in protecting against oppressive delay." (*United States v. Lovasco* (1977) 431 U.S. 783, 789.) It safeguards individuals from excessive delay between the commission of a crime and the initiation of criminal proceedings. (*Id*. at pp. 789-790.) While not every delay in charging violates the constitution, it is well established that precharging delay can substantially impair a defendant's ability to defend himself at trial. (See *United States v. Marion, supra*, 404 U.S. at p. 331 [Douglas J., concurring] ["At least when a person has been accused of a specific crime, he can devote his powers of recall to the events surrounding the alleged occurrences. When there is no formal accusation, however, the State may proceed methodically to build its case while the prospective defendant proceeds to lose his."].) No person should have to stand trial if the delay in charging was so great as to offend

21

basic standards of decency and fair play.  (*United States v. Lovasco, supra*, 431 U.S. at p. 790; *People v. Boysen* (2007) 165 Cal.App.4th 761, 774, 777.)

To establish a due process violation, the defendant must prove the existence of actual harm, "such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time."  (*People v. Abel* (2012) 53 Cal.4th 891, 908-909; see also *People v. Lazarus* (2015) 238 Cal.App.4th 734, 757.)  "If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay.  [Citation.]"  (*People v. Abel, supra*, 53 Cal.4th at p. 909.) "The balancing task is a delicate one, 'a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial.  [Conversely], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.'  [Citation.]"  (*People v. Boysen, supra*, 165 Cal.App.4th at p. 777.)  At bottom, the court must ascertain whether the precharging delay tilted the playing field against the defendant in such a way that it prevented him from receiving a fair trial. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256; *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 507; *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914.)

B.  *Was Trial Counsel's Performance Deficient?*

The initial question presented is whether trial counsel's failure to file a motion to dismiss based on precharging delay was objectively reasonable.  Respondent argues trial counsel made a reasonable tactical decision to forego making such a motion, and therefore his representation of Booth was not constitutionally deficient.  In so arguing, respondent claims Bradford's credibility was just too weak, and the risk of harm from further delaying the trial was just too great, to question trial counsel decision in this regard.  We cannot agree.

Respondent's argument is based on the assumption trial counsel arrived at his decision after "weigh[ing] the likelihood of success of a motion to dismiss for

22

preaccusation delay against potential costs of delaying trial." But that is not the record before us. At the evidentiary hearing below, trial counsel could not remember why he did not bring the motion or even whether he discussed it with Booth. Although he contemplated moving to dismiss based on Bradford's unavailability, trial counsel testified he could not "recall why [he] did not file . . . some type of due process motion." And as respondent correctly points out, the trial court found trial counsel to be highly credible; we are not at liberty to question his veracity on this point. (*In re Lawley* (2008) 42 Cal.4th 1231, 1241.)

Of course an inevitable consequence of trial counsel not bringing a motion to dismiss is that the trial was ultimately able to get started a little earlier than if he had brought the motion. Trial counsel himself articulated this during his testimony, and he also acknowledged Booth wanted to go to trial sooner rather than later for fear that codefendants Terrance and Lemaine Timms might turn state's evidence in the hope of receiving favorable treatment from the prosecution. However, trial counsel said this possibility was only a *theoretical* concern; he had no *specific* information that the Timms brothers had any incriminating evidence against Booth or that they were actually looking to make a deal with the state.

More importantly, as the trial court recognized, it is clear a motion to dismiss would not have delayed the trial in any material sense. In arguing otherwise, respondent contends that while Bradford's importance as a defense witness was made obvious early in the case, the trial court would still have had to give the prosecution the opportunity to justify the precharging delay that occurred. Respondent assumes this would have been a time-consuming task, but prosecutor Geller's testimony on this topic takes up only 50 pages of the evidentiary hearing transcript. Thus, the entire motion could have been litigated fairly quickly. Because of this, and because the motion could have resulted in a complete dismissal of the charges against Booth, the conjectural possibility of additional codefendants coming forward to testify against Booth was not a

23

reasonable justification for foregoing the motion. Indeed, we agree with the trial court that the state's argument to the contrary is not "remotely convincing." This was after all, a witness to the crime who explicitly exonerated Booth; the arguable prejudice was substantial.

Nevertheless, respondent argues trial counsel reasonably believed Bradford's credibility was so weak that it would not have been worth any delay in the trial to seek a dismissal based on Bradford's unavailability. This argument also fails for want of evidentiary support, as there is nothing in the record to substantiate respondent's claim that trial counsel lacked faith in Bradford as a witness. To the contrary, trial counsel testified he had his investigators look "high and low" for Bradford before trial because Bradford was a "very, very important person that [he] wanted to have." And this testimony came *after* the prosecution reminded trial counsel that Bradford's statements to the police were contradicted by Adray and that Bradford had problems identifying some of the suspects he implicated in the shooting. While trial counsel acknowledged these factors could have had an impact on Bradford's credibility, he still believed Bradford was a highly significant witness for the defense given that Bradford explicitly exonerated Booth of the shooting. At no time did trial counsel connect his failure to bring a dismissal motion with potential concerns about Bradford's credibility, so the Attorney General's attempt to do so is unconvincing. Considering the record in its entirety, we are convinced a reasonably competent defense attorney would have filed a motion to dismiss based on the circumstances presented in this case. Therefore, trial counsel was remiss for failing to do so.

C. *Was Booth Prejudiced by Trial Counsel's Deficient Performance?*

As we have explained, a defendant alleging ineffective assistance of counsel must prove both deficient performance *and* resulting prejudice. When, as in this case, the allegation is based on counsel's failure to bring a potentially dispositive motion, the defendant must show it is reasonably probable the motion would have succeeded at

24

trial. (*Wilson v. Henry* (9th Cir. 1999) 185 F.3d 986, 990; *People v. Maury* (2003) 30 Cal.4th 342, 394; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; *In re Elizabeth G.* (2001) 88 Cal.App.4th 496, 503-507.) We must therefore assess the merits of a motion to dismiss based on the precharging delay in this case. That requires us to balance the prejudice Booth suffered from the delay against the state's justification for the delay. (*People v. Abel, supra*, 53 Cal.4th at p. 909; *People v. Nelson, supra*, 43 Cal.4th at pp. 1249-1256; *People v. Boysen, supra*, 165 Cal.App.4th at p. 777.)

1. *Prejudice from the Delay*

The prejudice, as we have said, was substantial. It cannot be gainsaid that Booth lost a potentially powerful witness in Bradford because of the lengthy precharging delay that occurred in this case. By the time Booth was charged and the case was set for trial, Bradford – an eyewitness who told the police Booth was not among the group of men that carried out the shooting – could not be found and was thus unavailable to testify on Booth's behalf. In assessing the gravity of this loss, the trial court did not mince words – it described Bradford's absence as being "extremely prejudicial" to the defense and stated Bradford's testimony would likely have had "a substantial impact on the jury's view of the case." (Trial Court's Ruling, pp. 15-16.) Yet, thinking Bradford would have been vulnerable to possible impeachment, the court did not believe he would have been a game-changing witness for the defense. Rather, the court suspected that Bradford lied about having witnessed the shooting and that he probably learned the assailants' names from talking with Scottie and Stephen Strong. For reasons we now explain, we cannot adopt the trial court's opinion in that regard.

As a preliminary matter, respondent contends the trial court's finding that Bradford lacked credibility is entitled to great deference from this court. Deference on credibility issues is rightfully owed when the trial court has the opportunity to hear the witness speak and observe his or her demeanor. (*In re Lawley, supra,* 42 Cal.4th at p. 1241; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 78.) But in this case, the trial

25

court never saw the witness. Bradford's absence meant the court had to assess his credibility based largely on the police reports, the identification evidence and the recorded statement that Bradford made to investigators following the shooting. Because all of this information is in the record before us, we are in the same position as the trial court in evaluating Bradford's credibility. Therefore, we need not defer to the trial court on this issue. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [applying independent review to documentary evidence].)

There are two main ways in which this information could have been used to impeach Bradford had he been available to testify at trial. First, it showed Bradford was unable to identify some of the people he claimed were involved in the shooting. And second, it showed Bradford provided the police with a starkly different version of events from what he allegedly told Adray. We will address the significance of these circumstances in turn.

Regarding the identification process in general, we agree with the trial court's observation Bradford's ability to identify the people he allegedly saw carry out the shooting was likely hampered by two factors that were beyond his control. First, the photographs the police showed him were rather small and included men of similar age and appearance. Second, Bradford was not well acquainted with the people he implicated in the shooting. In fact, he did not even know their formal names. It is neither terribly surprising nor particularly revealing that he had some difficulty identifying them. Nonetheless, Bradford did identify the Timms brothers. He identified Lemaine as being at the shooting, and he identified Terrance as someone who was associated with the shooters. And, Bradford also consistently implicated Tommy "Lamont" Haslip, who admitted he was present at the time of the shooting. The fact these three all pled guilty in connection with the shooting increases Bradford's credibility.

The point about Bradford having consistently implicated Tommy Haslip is not only important in terms of assessing Bradford's credibility, it raises an issue

26

regarding the factual underpinning of the trial court's ruling. It is evident from the court's lengthy ruling that it painstakingly considered the evidence and arguments that were presented as part of Booth's habeas petition. We commend the court for laying out its findings and analysis in such detailed fashion. However, one of the reasons the court was skeptical of Bradford's credibility is because it believed Bradford originally identified Michael Haslip as one of the suspects. As the Attorney General concedes, that is not correct; Bradford originally identified "Lamont," who is Tommy, not Michael, Haslip. In fact, the trial court got Tommy and Michael mixed up throughout its written ruling. (See Trial Court's Ruling, p. 3, line 24 [mistakenly referring to Lamont as Michael Haslip]; p. 4, line 11 [mistakenly referring to Tommy Haslip as Lamont's brother]; p. 15, lines 22-24 [reflecting the misunderstanding that Michael Haslip's nickname was Lamont].) This makes it even more difficult to accord deference to a fact-finder looking at the very same facts we are.

As for the apparent discrepancy in Bradford's accounts of the shooting, the record is clear that Bradford gave the police a very different story from what he allegedly told Adray. Whereas Bradford told the police he never made contact with the victims on the night in question and merely witnessed the shooting from the outskirts of the parking lot, Adray claimed Bradford told him he was dodging bullets right along with the victims when the shooting occurred. Obviously, both accounts could not be true. However, in speaking with the police, Bradford denied telling Adray he was with the victims that night, and other than Adray's statement, there is no evidence to refute the truth of that denial.

Also, there was a plausible explanation as to why Adray might have been confused about what Bradford actually told him. Rumors around Adray's workplace were rampant following the shooting, and Adray himself admitted that, in addition to speaking with Bradford about what had occurred, he had multiple conversations with other employees before talking to the police. Thus, it is quite possible Adray's statement

27

to the police regarding Bradford's involvement in the shooting conflated, at least in part, Bradford's account with what he had heard from people other than Bradford. This possibility makes even more sense when we consider Bradford provided security for Adray's business. No one, least of all a security guard, would want to exaggerate his role in a gang-related shooting to the person who signs his paycheck.

In any event, other circumstances in the case generally support the notion Bradford was telling the truth when he spoke to the police, and he would have been a favorable witness for the defense. For example, unlike Tommy Haslip, Bradford was essentially a neutral witness. He did know the victims better than the assailants, but he was not a gang member, nor was he affiliated with either group. Furthermore, his description of how the shooting occurred and who carried it out was corroborated by other witnesses in the case, including Stephen Strong, who came face-to-face with the man who shot him.

Granted, when Bradford spoke with Scottie Strong after the shooting, Scottie said Stephen knew who the assailants were, so it is possible Scottie divulged this information to Bradford. However, Bradford denied this is what occurred. He also provided a very good reason for why the Strongs would not want him to know the identity of the assailants. According to Bradford, the Strongs sought to keep that information a secret from everyone outside their circle – including the police – so they and their friends could personally exact revenge on the people who shot Stephen Strong and Terry Ross. This "we'll-take-care-of-things-ourselves" attitude is a well-known hallmark of gang culture. Since Bradford was not a gang member, it makes sense the Strongs would be reluctant to let him in on the specifics of their revenge plan. It also helps explain why Bradford was hesitant to reveal the information he possessed. Given the gang dynamics surrounding the case, we can fully understand why both Bradford and the Strongs would ultimately be disinclined to talk about who was involved in the shooting.

28

And, as it turned out, Bradford's statement to the police about how the shooting transpired was actually more compatible with the facts than what the state's star witness Tommy Haslip alleged. Whereas Tommy told the police the shooter was standing toward the back of the victims' SUV, Bradford said he saw gun smoke coming from the driver's side of the vehicle, which is consistent with the fact the victims were both shot in the abdomen, an eventuality difficult to reconcile with shots fired from behind them. And although the trial court believed Bradford's convictions for spousal abuse and perjury cast a pall over his credibility, those convictions did not arise until 1998 and 2004, respectively. If Booth had been tried within a reasonable time of the murder in 1992, the convictions would not have been available to impeach Bradford.

The point is, despite all of the possible impeachment Bradford might have been subjected to had he been available to testify, he still had the potential to be a blockbuster witness for the defense. While it is impossible to know for sure how the jury would have perceived Bradford's testimony, it is reasonable to conclude Booth was substantially and materially prejudiced by Bradford's absence at his trial.

2. *Justification for the Delay*

That conclusion requires us to assess the strength of the justification for the 19-year delay that occurred from the time of the shooting until the time Booth was charged. Although prosecutor Geller did not have any personal knowledge about why the initial investigation in this case did not lead to any arrests, he testified the SAPD has the busiest gang unit in the county. He also stated the impetus for the second phase of the investigation, which led to Booth's arrest, was an influx of grant money that allowed SAPD investigators to reexamine homicide cases that had grown cold. Based on this testimony, respondent argues the lack of investigative resources provides a strong justification for the precharging delay that occurred in this case. We agree.

No one would dispute the SAPD lacks the means to exhaustively investigate every case that comes to its attention. Nor would anyone dispute that

29

"[s]ometimes a crime simply is not solved immediately but must await some break in the case[.]" (*People v. Cordova* (2015) 62 Cal.4th 104, 120 [lengthy precharging delay justified where sufficient evidence to charge the defendant did not exist until DNA technology was developed and used to connect him to the subject offense]; *People v. New* (2008) 163 Cal.App.4th 442, 465 [reopening of investigation into decades-old murder would not have occurred but for the discovery of new evidence linking defendant to the crime].)  These realities explain why the executive branch has broad discretion when it comes to deciding how to allocate scarce investigative resources and when to file criminal charges in a particular case.  (*United States v. Lovasco, supra*, 431 U.S. at pp. 790-796; *People v. Abel, supra*, 53 Cal.4th at p. 911; *People v. Nelson, supra*, 43 Cal.4th at pp. 1256-1257.)  And it is wholly admirable that SAPD kept after this case.  We applaud their efforts.

But that doesn't mean the police and prosecution are immune from judicial scrutiny when those decisions impact the defendant's fair trial rights.  Although the difficulty in allocating scarce prosecutorial resources is a strong justification for precharging delay (*People v. Nelson, supra*, 43 Cal.4th at pp. 1256-1257), courts will generally not countenance delays that are attributable to police negligence or intentional misconduct.  (See *People v. Hartman* (1985) 170 Cal.App.3d 572, 581 ["'negligence on the part of police officers in gathering evidence or in putting the case together for presentation to the district attorney . . . can hardly be considered a valid police purpose justifying a lengthy delay'"]; *People v. Pellegrino* (1978) 86 Cal.App.3d 776, 781 [the police cannot merely put an ongoing investigation "on the 'back burner' hoping that it will some day simmer into something more prosecutable"].)

So we must first deal with that question.  In this case, there is no evidence the delay in charging Booth was caused by police negligence or intentional wrongdoing.  Booth argues that given the evidence implicating Tommy Haslip in the shooting, the police were derelict for "fail[ing] to take the obvious[] investigative step of arresting or

30

interviewing" Tommy in 1992. And had they done so, Booth claims, Tommy would have told investigators that Booth was the shooter, Booth would have been formally charged, and Bradford would have been available to testify on Booth's behalf at his trial. There are several problems with this argument. For one, when he was interviewed in 2010, Tommy told the police that an investigator did contact him in the wake of the shooting but that he (Tommy) was unwilling to come in for an interview. And even if police had arrested Tommy at that time, it is purely speculative whether he would have cooperated with them since he was still embedded in the gang lifestyle at that time. (Cf. *People v. Cordova, supra,* 62 Cal.4th at p. 120 [rejecting as speculative defendant's claim that he was prejudiced by precharging delay]; *People v. Abel, supra*, 53 Cal.4th at pp. 909-910 [same].)

Third, and perhaps most importantly, it smacks of impermissible Monday-morning quarterbacking for Booth to argue that different investigative priorities and techniques would have led to him being charged sooner than he actually was. As our Supreme Court has explained, "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . *It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner*." (*People v. Nelson, supra*, 43 Cal.4th at pp. 1256-1257, italics added.) Yet, in criticizing the SAPD's failure to interview or arrest Tommy Haslip sooner than it did, that is precisely what Booth is arguing in this case. Therefore, we reject his claim the SAPD was negligent for failing to conduct their investigation differently. Since the precharging "delay was investigative delay, nothing else," the justification for the delay was strong. (*Id*. at p. 1256.)

3. *Balancing Prejudice and Justification*

That brings us to the balancing analysis, and makes it difficult. When, as here, there is both prejudice from, as well as justification for, the precharging delay that

31

occurred, the question of whether the delay violated due process will often depend on the strength of the prosecution's case. (*People v. Vanderburg* (1973) 32 Cal.App.3d 526, 532-534.) If the evidence of the defendant's guilt is strong, the likelihood of consequential prejudice from the precharging delay is reduced and a longer delay will be tolerated, but if the evidence against the defendant is weak, the claimed prejudice will take on added significance and enhance the probability of an unfair trial. (*Ibid.*)

Here, the prosecution's case against Booth was simply not very strong. It rested largely on the testimony of Charles Honea and Tommy Haslip, both of whom had considerable limitations as witnesses. Honea did "identify" Booth from a photographic lineup as the man he saw running in an alley near his apartment after the shooting. However, Honea was not sure Booth was actually the man he had observed. Honea merely stated that, of all the photos he was shown, Booth's "most closely resemble[d]" the man he saw in the alley. Perhaps this was because Booth was the only man pictured who had braided hair. Or perhaps this was because the lineup did not take place until over a month after the shooting. At any rate, the record is clear that when the police interviewed Honea at the scene of the shooting, he admitted he did not get a very good look at the person he saw. Thus, Honea's identification of Booth was suspect on a number of levels.

But compared to Tommy Haslip, the state's other key witness, Honea was the human equivalent of fingerprints. An experienced gang member who has a "Crip Killer" tattoo emblazoned on his arm, Tommy admitted to the police that Stephen Strong had actually shot him on a prior occasion before the 7-Eleven shooting occurred. However, Tommy told the police it was not him but Booth who shot the victims in retaliation for the incident that sent *Tommy's* brother Michael to the hospital earlier that evening. Respondent claims "there is no clue why Tommy [] would have been motivated to falsely name [Booth], who was his cousin and former co-gang member." And by the time the police got around to interviewing Tommy about the murder, he had moved out

32

of state, started a family and was no longer involved in gang activity. There is nothing to suggest Tommy still had any loyalty to his old gang when he was interviewed in 2010.

On the other hand, at the start of the interview, the police informed Tommy that they suspected he was the shooter. So by shifting the blame from himself to Booth, Tommy made himself look less culpable. Having been arrested multiple times in the past, Tommy also probably knew that if he claimed to have information about the shooter's identity, he might be able to cut a deal with the prosecution for a more favorable disposition of his own case. As it turned out, that possibility became a reality because while Booth faced a possible sentence of 25 years to life for first degree murder and was ultimately sentenced to 15 years to life, Tommy copped a plea to manslaughter and received a determinate sentence of 14 years in exchange for testifying against Booth at his trial. Given the benefit Tommy received for his testimony, it is easy to see why he may have been motivated to falsely implicate Booth as the shooter. So by fingering Booth, Tommy deflected suspicion away from himself for the murder of a man who has assaulted Tommy's brother and put himself in position to cop a plea to a *determinate* sentence rather than a life top. That seems to us to provide several of the "clues" the Attorney General could not find.[5]

The limitations of the prosecution's evidence were also revealed in the jury's verdict. Based on Tommy's testimony that Booth was the shooter, the state charged Booth with first degree murder and personally using a firearm. But the jury acquitted Booth of murder one and found the firearm allegation not true. It looks to us like the jury probably was of the opinion that Tommy was the shooter, not Booth. But

---

[5] At oral argument, respondent made much of the fact Tommy and Booth are related. Respondent wanted to know why, if it were not true, Tommy would implicate his own cousin Booth when he could have easily pinned the shooting on Demetrius Lopez. The answer probably lies in the fact that Michael tipped off Tommy before his interview that the police had been asking him (Michael) questions about both Tommy *and* Booth. Knowing this, Tommy likely believed that fingering Booth fit within the investigative narrative the police were trying to put together. Nothing in this record suggests to us that Tommy would put familial loyalty ahead of his own self-interest.

33

we need not speculate as to that issue. Our only concern is that the limitations of the prosecution's witnesses likely exacerbated the prejudice Booth suffered as a result of the lengthy precharging delayed that occurred in this case. Because of that delay Booth was unable to obtain the testimony of Ellis Bradford, who is on record as saying Booth was not among the people he saw carry out the shooting. Balancing the prejudice from Booth's absence against the state's justification for the precharging delay, and considering the weakness of the prosecution's case against Booth, we conclude it is at least reasonably probable the trial court would have found the delay violated Booth's right to a fair trial. Trial counsel was ineffective for failing to move to dismiss the case on that basis.

D. *Remedy for the Violation of Booth's Right to Effective Assistance of Counsel*

In fashioning an appropriate remedy in this case, we must keep in mind "habeas corpus is at its core, an equitable remedy." (*Schlup v. Delo* (1995) 513 U.S. 298, 319.) When habeas relief is warranted, our power is not limited "to either discharging the petitioner from, or remanding him to, custody [citations], but extend[s] to disposing of him 'as the justice of the case may require' . . . ." (*In re Crow* (1971) 4 Cal.3d 613, 619, quoting Pen. Code, § 1484; see also *Harris v. Nelson* (1969) 394 U.S. 286, 291 ["The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."].) Therefore, in issuing a writ of habeas corpus, courts have broad discretion to formulate a remedy that is tailored to redress the particular constitutional violation that has occurred. (*United States v. Morrison* (1981) 449 U.S. 361, 364; *Harvest v. Castro* (9th Cir. 2008) 531 F.3d 737, 744; *In re Crow, supra,* 4 Cal.3d at pp. 619-620, fn. 7; *In re Gutierrez* (1997) 51 Cal.App.4th 1704, 1709.)

In cases involving a violation of the Sixth Amendment right to effective assistance of counsel, we must strive to neutralize the taint of the violation, "'while at the same time not grant a windfall to the defendant or needlessly squander the considerable

34

resources the State properly invested in the criminal prosecution.'" (*Johnson v. Uribe* (9th Cir. 2012) 700 F.3d 413, 425, quoting *Lafler v. Cooper* (2012) __ U.S. __, __; 132 S.Ct. 1376, 1388.) For guidance on how to strike that balance here, we look to the case of *People v. Conrad* (2006) 145 Cal.App.4th 1175 (*Conrad*).

In *Conrad*, the defendant's brother made a potentially exculpatory statement to authorities during an investigation that led to the defendant being charged with failing to register as a sex offender. (*Conrad, supra*, 145 Cal.App.4th at pp. 1179-1180.) But the brother died before trial, and the state was unable to provide any justification for the delay in prosecuting the case. (*Id.* at pp. 1181-1182.) Finding the defendant could not be afforded a fair trial without his brother's testimony, the trial court dismissed the case on due process grounds. (*Ibid.*)

On appeal, the *Conrad* court recognized the defendant was prejudiced by virtue of the delay in bringing the case to trial. However, the court reversed the dismissal order as being too drastic a remedy under the circumstances presented. It held, "A trial court has discretion to fashion a remedy when the prosecutor's conduct has resulted in a loss of evidence favorable to the defense. (*People v. Price* (1985) 165 Cal.App.3d 536, 545 []; see also *People v. Zamora* (1980) 28 Cal.3d 88, 99 [].) When, as here, the delay in prosecution resulted in the loss to the defense of identifiable evidence, the prejudice to the defendant may be substantially mitigated, even virtually eliminated, by presenting the evidence to the jury through alternate means." (*Conrad, supra*, 145 Cal.App.4th at p. 1185.)

The alternate method adopted in *Conrad* was to have the trial court instruct the jury as to the substance of the brother's statement in a new trial. (*Conrad, supra*, 145 Cal.App.4th at p. 1186.) Even though the brother's statement was rank hearsay (*id.* at p. 1185), the court determined its admission was necessary to safeguard the defendant's constitutional rights. The court stated, "This is not a perfect solution to the problem of lost evidence; however, it adequately addresses the loss of relevant evidence in a manner

35

that affords defendant due process and a fair trial while allowing the prosecution to go forward." (*Id*. at p. 1186.)

Likewise, here, Booth's constitutional right to a fair trial can be accommodated by retrying the case and allowing the jury to hear the exculpatory statements that Bradford made to the police after the shooting. Despite the hearsay nature of those statements, their admission is necessitated by Bradford's unavailability and the unusual circumstances presented in this case. Since Bradford's statements have been preserved on tape, the jury will be able to hear exactly what he said and how he said it. We leave to the trial court to decide how best to effectuate this remedy when the matter is retried. So long as the subject evidence is presented to the jury in a manner that protects Booth's constitutional right to due process and a fair trial, the interests of justice will be served by allowing the prosecution – should they so choose – to retry him for the serious crime that occurred in this case.[6]

## IV. DISPOSITION

The petition for a writ of habeas corpus is granted, the judgment is reversed and the matter is remanded for a new trial that shall be conducted in conformance with the views expressed herein. The appeal is dismissed as moot.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

---

[6] Because we find Booth is entitled to a new trial on the grounds his attorney was ineffective for failing to bring a motion to dismiss due to precharging delay we need not consider whether defense counsel was ineffective for the other reasons alleged in Booth's petition. This finding also renders moot the claims raised in Booth's direct appeal.