Filed 12/23/20  P. v. Cauble CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY DUANE CAUBLE,<br><br>    Defendant and Appellant. | D076215<br><br><br>(Super. Ct. No. SCD275889) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Reversed and remanded.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Michael P. Pulos, Joseph Christian Anagnos and Kathryn A. Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

In 2019, a jury convicted Jeffrey Duane Cauble of the 1979 second degree murder of C.W. (Pen. Code,[1] § 187), and found true allegations that Cauble personally used a knife in the crime's commission (§ 12022, subd. (b)(1)). The court sentenced Cauble to 15 years to life plus a one-year enhancement for the knife use allegation. Both before and after trial, the trial court denied Cauble's motions to dismiss the case on grounds of unjustified precharging delay. It denied Cauble's posttrial motion for a new trial claiming counsel's prejudically ineffective assistance.

Cauble contends: (1) 40 years of precharging delay deprived him of his due process right to a fair trial; (2) his defense counsel provided prejudicially ineffective assistance by failing to call a forensic expert, breaking a promise he made during opening statements that Cauble would testify at trial, and failing to challenge improper and prejudicial evidence; and (3) the prosecutor committed prejudicial misconduct by vouching for an erroneous fact not in evidence.[2]

We reject Cauble's claim of prejudicial precharging delay. However, we agree that his counsel's errors, combined with the prosecutor's improper closing argument discussing a scientific fact not in evidence—which undermined Cauble's theory of self-defense—require a new trial. We reverse the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Cauble has also filed a petition for writ of habeas corpus. We ordered the writ petition considered with this appeal so as to determine whether an order to show cause should issue. By separate order we deny the petition as moot.

FACTUAL AND PROCEDURAL BACKGROUND[3]

*C.W.'s 1979 Killing and Investigation*

In the afternoon of February 5, 1979, C.W., a taxi driver, was found stabbed to death in bed at his home. He was unclothed in a curled up position. C.W. had suffered multiple stab wounds, the first probably through his neck, perforating one carotid artery and severing the other. He had several knife wounds to his back, some that penetrated his lungs. C.W. did not have any defensive wounds to his hands. C.W.'s bedding had cut marks: 12 in a blanket and eight in a sheet.

Paul Ybarrondo, then a sergeant in the San Diego Police Department in the homicide unit, investigated and supervised the team that responded to the scene. Ybarrondo did not see signs of forced entry. He observed drinking glasses, cigarette butts and ashtrays in the living room as well as clothing indicating the victim and another person had removed their clothes there then went to the bedroom. An evidence technician collected items including the drinking glasses and some of the remaining liquid, the ashtrays and cigarette butts, two towels, C.W.'s bedding, and miscellaneous pieces of paper in a small wooden chest with names and phone numbers written on them. Underneath the wooden chest the technician found and collected a napkin with handwriting having Cauble's name, social security number, birth date, driver's license number, and the words, "Camp Pen." The technician obtained fingerprints from a glass tumbler, ashtray, bottles of alcohol and the pieces of paper. He impounded the blanket and sheet. A steak-type knife

---

[3] This court granted Cauble's unopposed requests to augment the record on appeal.

3

was found in the sink but it did not have usable fingerprints.[4]  No drugs were found in C.W.'s apartment.  Given the nature of the crime scene, the technician took and impounded swabs from various parts of C.W.'s body, including his mouth and penis.

A criminalist tested the sheets, blankets and towels and found type O blood on them.  One sheet and blanket had apparent one-half to three-eighths inch cuts on them.  She detected type O blood in swabs collected in the bathroom.  She was unable to detect saliva on either of the drinking glasses.  The criminalist did not test the contents of one glass for alcohol or drugs because she was not told the liquid had been separated into a test tube; however, she explained testing capabilities were more limited then and she was not sure so-called "date rape" drugs, which dissipate quickly, could be found in the liquid.  At the time, she was able to test for barbiturates, amphetamines, narcotics and alcohol.  174 latent finger print cards were collected from the crime scene, but not all of them were suitable for comparison.  Some of the prints were eventually identified as being from C.W.'s former roommate and the roommate's girlfriend.

Sergeant Ybarrondo checked the pockets of the clothing on the floor and found C.W.'s wallet, which contained no money.  He acknowledged learning about the napkin with Cauble's name.  Ybarrondo was not aware of follow up efforts with regard to the napkin, though it was something he would have directed his team to follow up and determine who the person was and his connection to the case.  Sergeant Ybarrondo's team interviewed more

---

[4]    The People presented evidence that C.W.'s kitchen had a shelf with an open silverware tray on it.  The investigating sergeant agreed that an investigator noted the tray was "where potentially the murder weapon could have come from."

4

than 20 people and conducted different avenues of follow up investigation. However, at some point, the investigation became "cold" because leads had gone nowhere.

In 2004, David Cornacchia, a criminalist working on cold cases for DNA evidence reviewed C.W.'s case. He was able to ascertain the victim's DNA as a reference, and determined there was DNA from a foreign contributor on the victim. Cornacchia notified the homicide team that if they developed a suspect, they could ask him to do a comparison.

In 2006, the case was reopened when investigators uploaded an unknown fingerprint from the scene into a database, producing a hit for Cauble. Such hits do not automatically result in an arrest, as it is just one lead requiring follow up including to rule out other potential suspects.

In December 2008, then San Diego Police Department Detective John Tefft was assigned to the cold case. He reviewed all the evidence and learned that Cauble had been identified as a source of two fingerprint impressions that were confirmed by the laboratory in 2007. He followed up on those as well as a woman's prints found at the scene. The woman had dated one of C.W.'s roommates. As to Cauble, nothing in the reports or evidence other than the cocktail napkin related to him; the detective recalled finding an address book and contacted friends or relatives of C.W. but was unable to get leads on why Cauble would be present at the scene. He eventually obtained a search warrant to get Cauble's DNA and fingerprints.

In March 2009, Tefft interviewed Cauble at Cauble's Colorado home about the murder. Cauble denied knowing C.W. or being in his home. In a follow up telephone call the next day, Cauble again told Tefft he was not at C.W.'s house. Cauble asked why it took so long for police to contact him, and Tefft explained based on his experience that computer, DNA and fingerprint

5

technology had changed remarkably from 1979. Tefft also floated a possible scenario to Cauble based on his past experience and training so as to communicate to Cauble that he was open to hearing about the situation. Tefft explained to Cauble that in the detective's experience, "many times back in 1979 especially, in that era, many times military personnel, they're away from home the first time, they are kind of young. Sometimes they get befriended by folks, usually gay men, and they take them back to their home and they sometimes have sex. The next day there is remorse, some shame, and sometimes violence occurs. I have investigated that as a police officer several times in my career." When Tefft asked Cauble if something like that happened, Cauble responded that he would not know as he was not at the crime scene. Detective Tefft informed Cauble that additional laboratory tests might reveal Cauble was present at the crime scene, and Cauble responded: "If I see you again, it's because I'll be going back to San Diego with you. I'll just have to straighten this thing around in court."

The following month, Detective Tefft had criminalists compare Cauble's DNA sample against the penile and mouth swabs taken from C.W. There was either no DNA or not enough DNA from the drinking glasses to draw conclusions. The lab results showed strong support that Cauble was a contributor to the DNA in both penile and mouth swabs, however. DNA from blood on the towel and from two of the cigarette butts matched Cauble's DNA. But no DNA was found on a soda bottle, and Cauble was excluded as the source of DNA from the bedding. Detective Tefft retired in mid-2009.

In May 2009, a new detective was assigned to the case. He interviewed witnesses, and specifically sought to locate a man, Francisco Guizar, who had been seen running from the property on the day C.W.'s body was discovered.

The detective obtained new DNA results pointing to Cauble's presence at the scene.

In June 2011, the detective decided to again interview Cauble. The recorded interview took place in the detective's vehicle in a parking lot. At the outset, Cauble expressed concern about being arrested but the detective told him that would not happen. During this interview, Cauble did not deny his fingerprints were found in C.W.'s house, but claimed he did not remember being there. When the detective told Cauble his DNA was found on C.W.'s penis, Cauble claimed not to remember anything, and stated: "The only thing I could think of is that, uh, you know, the guy probably drugged me and, you know, I don't remember a thing about it, and then probably seduced me. That's the only thing I can think of." When asked whether that happened, however, Cauble said, "As far as I know, no, it did not happen." Cauble denied having sex with men. After Cauble was told his semen was found in the victim's mouth, he told the detective he was apparently drugged, raped and his wallet taken, but said he did not remember that happening, losing consciousness, or waking up in someone's house. Cauble denied getting into a fight with the victim, being angry, or murdering anyone. The detective thought it was significant that Cauble did not remember waking up from a state of unconsciousness. The detective did not arrest Cauble that day because the purpose of his visit was to get Cauble's explanation of what had happened. The detective presented to district attorneys the recording and a written record of what he had learned from the interview. He retired in 2012.

In 2017, an expert determined that the handwriting on the napkin found in C.W.'s apartment was probably C.W.'s. In about May of that year, the San Diego Police Department cold case unit presented C.W.'s case to the district attorney and a new investigator, Sandra Oplinger, was assigned.

7

Oplinger reviewed all of the police reports from 1979 and subsequent investigations, as well as the evidence, which was still labeled and secure within its packaging. She was aware Cauble had denied being at C.W.'s apartment, knowing him or having a sexual relationship with him. She decided to conduct a jail operation on Cauble to get him to brag or talk about the matter.

In March 2018, police arrested Cauble and put him in a cell with an undercover officer posing as an inmate. At one point, Oplinger entered the cell and while speaking to Cauble held up an autopsy photo of C.W. When the undercover officer asked Cauble if he saw the photo and told Cauble it appeared the victim had bullet holes, Cauble responded that the victim "died, from a stabbing," and laughed. Cauble remarked, "They don't have shit on me. Not after 35 years." Cauble also told the officer his blood was at the scene because there was a fight. Cauble explained: "This was a gay guy. [¶] . . . [¶] He was a taxi cab driver. I was a Marine. [¶] . . . [¶] . . . I was all fucked up, he picked me up, I was going to go to a motel. [H]e said come over to my place (unintelligible) drugged me and the drugs (unintelligible). [¶] . . . [¶] . . . And he drugged me, uh, he raped me. [¶] . . . [¶] And, uh, I confronted him (unintelligible), we started fighting I got the better half (unintelligible)."

Two days later, Cauble spoke with his wife in a recorded jail call. In part, he told her he would be extradited and booked for murder, and expressed concern that if he was found guilty he would be going to jail forever, and would become suicidal. When his wife remarked that he did not do it and would get out, he responded, "Wait a minute, I killed a man. [¶] . . . [¶] . . . But let me tell you something, . . . he lied to me, then he drugged me, they have this on . . . and not only did he drug me, he stole from me, not only

did he steal from me, he followed me, and he, and I, and I killed him. It was self-defense that's all it was, was self-defense I swear to God. It was self-defense." Cauble's wife reminded him the call was being recorded, and Cauble said, "It's on. It's, that's what I'm gonna, that's, that's what I'm, that's what I'm gonna go by. You know, I'm, I'm gonna go with, I'm gonna go with that and I'm speaking the truth." After further conversation, Cauble told his wife that the victim was gay and drove a taxi; Cauble entered his taxi to go somewhere but ended up going with the victim to his place, where he was drugged by something he drank in a cup. Cauble told his wife the victim tried to rape him, and that his own DNA was found on the victim's penis.

Prosecutors charged Cauble days after his interview and telephone call.

In June 2018 a criminalist tested the two liquids from the drinking glasses and detected no date rape drugs or other controlled substances. She tested for ethanol, but the amounts were at such a low percent that she could not say it was an alcoholic beverage. She agreed that result could be explained by evaporation.

*Motions to Dismiss for Pretrial Delay*

Before trial, Cauble moved to dismiss all of the charges against him, claiming unconstitutional, unjustified and prejudicial "pre-complaint delay" in the prosecution of the case. Cauble stated he was out at a bar and about to complete his enlistment with the Marine Corps when C.W. enticed him to come to his apartment and drugged him. Cauble stated he awoke to find C.W. attempting to sodomize him and it was C.W. who produced the knife, which Cauble used to stab C.W. in self-defense. Cauble argued he suffered extreme prejudice by investigators' failure in 1979 to determine whose handwriting was on the napkin, follow up on the information on the napkin, or test the contents of the liquid in the drinking glasses found at the scene.

9

Cauble also argued that the FBI had his fingerprints on file as of 1976, but police did not call the FBI or authorities for his military record to identify the fingerprints found at the scene. He argued several critical witnesses who would have testified about C.W.'s character, habits and customs had since died, including one of C.W.'s friends who found the body, two individuals who saw C.W. on the night he died, a former roommate, and cab drivers or cab company employees who knew C.W. and interacted with him on the morning of C.W.'s death. He pointed out that two of the investigating detectives were deceased. According to Cauble, material evidence was "essentially" lost or destroyed including the napkin (which he claimed was ignored for 30 years) and contents of the drinking glass, which had not been tested by the criminalist in 1979.[5] He maintained the lost witnesses, dimmed memories, and lack of physical evidence severely prejudiced his ability to fully and fairly put on a defense, and the People lacked any reasonable justification for the prolonged delay in prosecuting him.

In opposition, the People pointed out Cauble's fingerprint was not identified until 2007 and they did not develop enough evidence to charge him until his March 2018 admission to the undercover police officer. They asked that Cauble's motion be deferred until after trial, arguing he could not establish nonspeculative, actual prejudice until the court could assess testimony and evidence of Cauble's guilt. In part, the People argued there was no evidence or indication the preindictment delay was intentional or done to gain a tactical advantage, given the limited technology and efforts by detectives to run new tests, confirm old ones, and re-contact witnesses.

---

[5]     Cauble pointed out that the contents of the drinking glasses were presently being tested, but the laboratory had not issued results as of October 2018.

Recounting the substance and significance of various witness's testimony, they argued Cauble could not establish actual prejudice from missing witnesses or evidence, the justification for the investigatory delay far outweighed any prejudice to Cauble from the passing of time, and the strong evidence of Cauble's guilt weighed against any prejudice caused by the delay.

After hearing lengthy arguments and relying on the principles in *People v. Nelson* (2008) 43 Cal.4th 1242, the court denied the motion without prejudice to it being renewed at the trial's conclusion. It found Cauble had not shown any delay designed to create a tactical advantage for the prosecution. The court found no indication of negligence, pointing to the existence of numerous latent prints and items of paper with names and addresses found in C.W.'s apartment, as well as the absence in 1979 of any connection between Cauble and the latent print. The court found the People showed strong justification for the delay, and in view of the questionable admissibility and speculative nature of the lost witness testimony, Cauble had not made an adequate showing of prejudice to establish a due process violation.

*Defense Counsel's Motion to Withdraw*

In December 2018, Cauble's retained defense counsel moved for a continuance of the trial date on grounds he had recently been served with an additional 852 pages of discovery, he had been given revised jury instructions using 1979 law, he needed to retain a handwriting expert, and his wife was extremely ill in hospice care for late-stage terminal cancer. The court continued the trial to late January 2019.

About 10 days before trial, Cauble's attorney moved to withdraw as counsel of record on grounds he was experiencing difficulty in effectively conducting the case after his wife's recent death. Counsel asserted his

11

mental and physical condition rendered him unfit: his wife's prolonged illness and death "devastated [him] both emotionally and physically" and antianxiety and sleep medications prescribed for him were not working. Counsel stated he was unable to carry out his duties to Cauble competently under the circumstances, and it was in Cauble's best interests that he withdraw from representation. After an unreported chambers conference concerning the request however, counsel withdrew the motion.[6]

*Trial Opening Statements and Testimony*

The prosecutor in her opening statement recounted parts of Cauble's interview with the detectives who visited him in Colorado and his denials that he knew C.W. or was at C.W.'s apartment. She pointed out that Cauble proposed to detectives he had been drugged and raped, but did not remember it. The prosecutor explained Cauble had denied being in a fight or confrontation. She told the jury they would hear Cauble tell the undercover officer that C.W. had raped him and that Cauble confronted and stabbed C.W. and "got the better of him." She said the People would ask the jury to find Cauble guilty of murder.

In his opening statement, Cauble's defense counsel told the jury the case was not a "whodunit"; that Cauble had killed C.W. but the issue was why he had done so. Counsel told the jurors he would "tell [them] what I think the evidence will show." He proceeded to recount the events of the night and morning before C.W.'s death in detail from Cauble's perspective, relating details as to why Cauble went to a downtown bar, his conversation

_____

[6] The court's decision to conduct this chambers conference without a court reporter is inexplicable. A matter of such critical importance should not have been left unreported. Trial courts must be mindful that a party in a criminal case is entitled to a sufficient record to provide him or her a meaningful appeal. (*People v. Callahan* (1985) 168 Cal.App.3d 631, 632.)

with C.W., what Cauble remembered after he arrived at C.W.'s apartment, what C.W. said to him, Cauble waking up sexually aroused with C.W. attempting to sodomize him, and the ensuing fight. According to counsel, the stabbing was in self-defense: C.W. produced a knife and "drew first blood," which explained Cauble's blood at the scene, but Cauble, a "20-year-old combat-ready Marine," struggled with C.W., took the knife away and "stab[bed C.W.] multiple times, wildly." Counsel said, "He'll probably—he will testify [he stabbed C.W.] in a blackout or a partial blackout as a result of being roofied by [C.W.]" Counsel told the jury Cauble went back to Camp Pendleton with a "very, very fuzzy memory of what occurred," and described it as a "nightmare, as a matter of fact." Counsel stated the evidence would show Cauble and C.W. "were in a fight and that Mr. Cauble had reasonable cause to believe and be in fear of his life." He told the jury that Cauble would explain some of his answers to detectives during the 2011 interview about C.W.'s murder. Counsel concluded: "You'll have to listen very carefully to the testimony of Mr. Cauble. He is a decent person and lived a relatively good life, like all of us and all of you."

During trial, the People presented evidence that in 1979, forensic analysts performed blood typing but there were no computer fingerprint databases available, and DNA testing was very limited. In 1979, the nationwide CODIS (Combined DNA Index System, see *People v. Buza* (2018) 4 Cal.5th 658, 668) database did not exist. DNA typing did not start in San Diego until 1996 or 1997. Computer capabilities were not the same as today. When working with the military, investigators had to do personal or telephone contact with military authorities to track people down. Fingerprints were sent to a laboratory and handled manually by comparing the unknown print with a known print.

13

Detective Tefft was permitted to testify that he advised Cauble of his experience investigating crimes of violence involving young military personnel who experience shame and sometimes violence after befriending and having sex with gay men.

Criminalist Cornacchia testified about his 2004 testing of various items for DNA on C.W.'s murder case. He related how he found only Cauble's DNA on a hand towel found in C.W.'s bedroom. He found Cauble's and another person's DNA on another towel. As for C.W.'s bedding, Cornacchia excluded Cauble and C.W. as DNA contributors as to one sample. He identified C.W. as a contributor to another sample. He excluded Cauble from the remaining DNA profiles from the bedding. Cornacchia did not draw conclusions about the cuts in the bedding. However, he explained why he focused on the red stains in C.W.'s bathroom, stating he had worked on stabbing cases in which the homicide perpetrator injured himself and would use the bathroom at the scene to tend to the wound before leaving. He said, "When I saw that blood mixed with water, I thought to myself perhaps the individual had injured themselves and were attempting to clean up." But Cornacchia either got no DNA at all or got such a small amount that it was unsuitable for interpretation.

Investigator Oplinger testified about her investigation and decision to conduct the jail operation. She described it as a "last effort" done when a case comes to a "dead end." She also testified that she had reviewed the blanket and sheet, and what caught her attention was they both had multiple stab wounds in "very close proximity of each other." When asked the significance, she stated: "[B]ased on my training and experience, based on shooting also, to have a close proximity like that it is not random all over. This was very controlled, in my opinion, controlled stabs. They're very close proximity. And

14

in my opinion—I'm not an expert—but it doesn't appear that the victim was moving about a whole lot because it is so close." Counsel asked Oplinger: "The concentration of . . . these cut wounds, would they appear to be consistent with the injuries or the stab wounds on the victim that you saw?" Oplinger responded, "I would think so, yes."

The People played audio and video recordings of Cauble's statements to the undercover officer while in jail.[7] They also played the recording of Cauble's jail visit with his wife in March 2018. Following the playing of the call, this sidebar exchange took place:

"[Defense counsel]: This changes the scenario. . . . I'll tell you why very briefly. I don't know this—this is another media thing. I never got video of that tape. All I got was a transcript of [Cauble's wife] and his conversation. That's okay. That's fine. But it changes my scenario where he may—he—I need to talk to him. . . . He may not testify now. I have to give him an opportunity to tell me what he wants to do." Counsel advised the court he did not have any other witnesses. The prosecutor responded that the recording was part of discovery and played at the preliminary hearing. She stated she had given counsel a list and transcripts of everything she would be playing. Defense counsel clarified, "I don't remember seeing it at the prelim[inary hearing], but hey, you know, I'm not saying it wasn't. I just don't recall."

---

7       The video of the jail operation apparently shows Cauble making a stabbing motion when describing how the victim died. Defense counsel initially objected to playing the videotape of the jail operation, claiming he had never seen it and it was not produced in discovery. The prosecutor explained defense counsel had received a CD with both the audio and video on it. The court had the prosecutor play the video for defense counsel, who then told the court he had no objection to it being played to the jury.

Following a break, the court addressed the prospect of Cauble resting without putting on a case, and addressed him: "Ultimately, the decision, Mr. Cauble, as to whether or not you testify, you have an absolute right to remain silent, which [defense counsel] has stated you intend to invoke. You also have an absolute right to testify. In other words, whether you get on the stand and testify is completely up to you. I just want to make sure that the decision for you not to testify is yours." Cauble responded: "The decision is my own, Your Honor."

Cauble did not present evidence in his defense.

*Closing Arguments*

The prosecutor began her closing argument by telling the jury that "the only reasonable interpretation of all the evidence here is that Mr. Cauble and [C.W.] engaged in sex and that then Mr. Cauble brutally murdered [C.W.] while he was sleeping in his bed and then left." She recounted what she said was the evidence of what occurred on the evening and early morning hours before C.W.'s death. She told the jury it was logical that C.W. and Cauble went to C.W.'s apartment and had a consensual social interaction based on the scene: the alcohol, Cauble's fingerprints on the glasses and liquor bottles, the cigarette butts in the ashtray from Cauble smoking, the clothing on the floor, and C.W. unclothed in bed. She argued:

"[Cauble was a]ctive, pouring his own drinks. How do we know that? Fingerprints on the liquor bottles. Again, smoking. And the way those clothes are like that, right, the way his clothes are taken off right there, that is evidence that they were drinking in here. They were—Mr. Cauble, at least, because there is no evidence of [C.W.] smoking any cigarettes. Smoking cigarettes, alert, probably drinking though. There is no question there is alcohol being consumed here.

16

"Again, we're talking about you may make some decisions you may regret later when you're drinking. They're still your decisions, and you're still accountable for them.

"They go into the bedroom, and they engage in consensual sex, contrary to Mr. Cauble's later claims, just sort of, 'Oh, I must have been raped. I wasn't raped. He tried to rape me.' I'm not saying a man cannot be a victim of sexual assault, but there are very different things about a man and a woman and how they respond sexually and what you can do to somebody or how can you respond when you're engaged in sex. Mr. Cauble's semen is in [C.W.'s] mouth. Mr. Cauble had to be awake and aroused for that to have occurred.

"[Defense counsel]: Objection. Your Honor, there is no evidence of that.

"The Court: Overruled.

"[Prosecutor]: Common sense. Now, when he is confronted with that, that may be how you would try to explain that. That is the truth. That is the truth. Not only is his semen in [C.W.'s] mouth, his semen is on [C.W.'s] penis, as well as on the non-sperm fraction. His DNA is there. [¶] All of that evidence supports a consensual sexual encounter, one that Mr. Cauble may later have regrets about. But nonetheless, that is what it was."

The prosecutor continued: "[R]emember, Detective Tefft talked about that and his experience back in the 70's. Military men would get picked up. They would drink. They would engage in sex. They would wake up, feel ashamed, remorse, regret, and then assault the person that they had sex with, the male that they had sex with. That is what happened here."

Defense counsel did not contest that Cauble killed C.W. He told the jury that Cauble was drugged and acted in self-defense in the face of a rape

or attempted rape; that he feared great bodily harm and that Cauble's blood on the towel corroborated his story. Counsel argued Cauble was taken advantage by C.W., characterizing C.W. as a rapist or "con man who drugs people that he finds on the street." He emphasized Cauble's story to his wife in the jail call, telling the jury it was important to remember "how she talked, how he talked, how they reacted" when he told her C.W. tried to rape him but he had no specific memory of it.

In rebuttal, the prosecutor addressed Cauble's claim he was drugged and acted in self-defense. She pointed out C.W. sustained no defensive wounds, stating he was killed while he was asleep. She argued: "Counsel didn't even talk about the bedding. You know why? Because the only explanation for that is that [Cauble] stabbed through the sheets in a bed while [C.W.] was sleeping. It is why [defense counsel] doesn't even touch it. There is no other reasonable explanation for that. It is why we brought that in. It is why those cuts are there." She argued Cauble's regret and remorse after sobering up was not provocation under the law. She pointed out no drugs were found in C.W.'s apartment, and argued against the theory that Cauble awoke from use of a date rape drug, suggesting Cauble made up the story because he was intoxicated then felt bad about his actions: "You drink too much. You regret you had it. Something must have been put in my drink. I never would have done that on my own. Or you drank too much. You drank, and you made bad choices. It happens to everyone. [¶] There is no evidence of that, no evidence of the drugs at the house. They looked through that place meticulously. . . . It wasn't there, because it didn't happen. [¶] The only way I ever would have came [*sic*] in someone's mouth was if I was drugged. Physically, that is impossible. And, two, that is not true. That is a way for you to kind of explain or justify why that happened."

18

The prosecutor argued the physical evidence showed Cauble was awake, then stated: "Again, I went through this again. There is no way he is unconscious when he ejaculates in [C.W.'s] mouth. . . . [¶] . . . [¶] When you look at all of the physical evidence and use your common sense, the only reasonable interpretation of the evidence is that Mr. Cauble, after he had sex, consensual sex with [C.W.], went to the kitchen, got that knife, and made sure [C.W.] could not tell about it. He stabbed him viciously and repeatedly. . . . That is murder."

*Jury Notes and Verdict*

The jury commenced deliberations on a Friday morning. During deliberations, jurors submitted one question asking for the "full legal definitions of [first], second degree murder [and] voluntary manslaughter, beyond the judge's instructions[.]" Jurors also asked to see the knife. The court directed the jury to the instructions given on murder, first degree murder and voluntary manslaughter, telling it in part there were no additional instructions beyond what it had given, and, "If you conclude a murder was committed it is murder of the second degree unless you find the defendant to have acted willfully, deliberately, and with premeditation." The court explained that voluntary manslaughter is based on different theories where a killing occurs in a sudden quarrel or heat of passion, or the defendant acts in imperfect self-defense.

The following Monday afternoon after about seven hours of deliberations, the jury returned its verdict. It acquitted Cauble of first degree murder and returned a verdict for second degree murder.

*Renewal of Motion to Dismiss for Precharging Delay*

Following trial, defense counsel renewed his motion to dismiss for prejudicial precharging delay. After considering the trial evidence and

19

parties' arguments, the trial court in a lengthy ruling recounted the early investigation in 1979, the technology limitations and advances through the years, the potential suspects who were identified and eliminated, Cauble's lies to investigators, and events leading up to the prison operation in which Cauble admitted to the killing. The court again found "absolutely no negligence" by police who were "not to be faulted for delaying a prosecution of somebody for . . . a crime such as murder until they are certain that they have sufficient evidence to convict." The court continued: "Instead of being prejudiced by . . . the fact of the delay, the defendant was able to spend 40 years out and about in Colorado, living his life, instead of spending it in the state prison in California. [¶] Was there any prejudice to the defendant by the loss of evidence? No. None whatsoever. [¶] There were no percipient witnesses to the crime. There were no percipient witnesses who saw Mr. Cauble leave with [C.W.] from Green's bar or anywhere. There's no credible evidence that any of those things existed. [¶] . . . There's no evidence that there was any drugs that were present in connection with the house. None of that stuff was destroyed. It was all collected and it was recorded. If there was anything to be found in there, the evidence was all preserved. It was available for testing. [¶] There was no prejudice. The motion . . . to dismiss for the prearrest delay is denied."

*New Trial Motion*

Cauble unsuccessfully moved for a new trial on grounds his trial attorney provided ineffective assistance in multiple ways. In part, he argued his counsel failed to object to improper testimony from various witnesses or present certain experts, advised Cauble not to testify by exaggerating the strength of impeaching testimony and underestimating the strength of the People's case, did not present evidence to rebut the People's claim that

20

Cauble had attacked a sleeping and defenseless C.W. because Cauble was upset about having sex with him, and did not adequately advocate during closing arguments that the People failed to meet their burden to prove beyond a reasonable doubt the absence of self-defense.

The court denied the motion. It engaged in a lengthy analysis of the trial evidence as well as Cauble's statements and ultimate confession, finding that once the DNA testing and fingerprint analysis came through "the evidence in this case was not close, not at all." In part, the court stated how in its view the physical evidence belied Cauble's claim of self-defense but that Cauble had presented the defense in any event by his recorded statement, leading it to conclude there was no reasonable probability the result of the proceeding would have been different absent any error on the part of his counsel.

## DISCUSSION

### I. *Claim of Prejudicial Precharging Delay*

Cauble contends that 40 years of delay in charging him deprived him of his due process right to a fair trial. He maintains the delay resulted in the loss of "blockbuster" witnesses—cab company employees who interacted with him the morning of his death and one of C.W.'s former roommates— which maximized the prejudice to him. Cauble presented police interview reports taken on the day of C.W.'s death with statements from employees Dorothy Birse and Charlotte Davidson, who died respectively in 1995 and 2015, and taxi driver Mike Goldstein, who died in 1984. Birse related to officers that she was working a cashier stand and checked C.W. in at about 5:00 a.m. Birse "vividly" remembered it because C.W. paid the balance of his taxi lease with a single $100 bill, even though he had logged only one fare, and also told her he met a friend, saying, "You know how things like that go," and "If you

21

can make more money by not working." Davidson recounted that C.W. told her he had not worked that night and would not be joining her at their usual coffee shop, telling her, "I've got someone waiting for me at home." Davidson told police that C.W. "said it like the cat that ate the canary." Goldstein drove C.W. home and did not see anything unusual such as lights on at C.W.'s apartment or anybody standing on the porch. Cauble also presented a statement taken from John King, a former roommate of C.W.'s, who told police there were always male strangers coming in and out spending the night, and that it would be unusual for C.W. to leave someone in the house while he went back to work because he had some nice things. King died in 2004.

Cauble argues these witnesses gave consistent testimony supporting his story that C.W. drugged and robbed him; their statements would have permitted the jury to conclude that when C.W. left his apartment he had time to dispose of the drugs he used on a captured and unconscious Cauble. Cauble argues: "As a result, the jury lacked the strongest evidentiary basis to reject the prosecution's theory that Cauble never lost consciousness." He further argues the People's delay was unreasonable given the napkin evidence and the fact that by 2011 investigators had confirmed his fingerprint and DNA matched samples collected from C.W. at the scene. According to Cauble, the substantial prejudice to him by the lost witnesses outweighed any justification for the delay, but the weakness of the People's case against self-defense tipped the scales toward a due process violation.

A. *Legal Principles*

A defendant seeking to dismiss a charge for denial of the right to a fair trial and to due process of law under the state and federal Constitutions, "must demonstrate prejudice arising from the delay. The prosecution may

22

offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1250.)  Courts do not presume prejudice from precharging delay.  (*Ibid.*; *People v. Cordova* (2015) 62 Cal.4th 104, 120; *People v. Abel* (2012) 53 Cal.4th 891, 908-909.)  "To establish a due process violation, the defendant must prove the existence of actual harm, 'such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time.'  [Citations.]  'If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay.  [Citation.]'  [Citation.]  'The balancing task is a delicate one, "a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial.  [Conversely], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal."  [Citation.]'  [Citation.]  At bottom, the court must ascertain whether the precharging delay tilted the playing field against the defendant in such a way that it prevented him from receiving a fair trial."  (*People v. Booth* (2016) 3 Cal.App.5th 1284, 1302-1303.)

"When . . . there is both prejudice from, as well as justification for, the precharging delay that occurred, the question of whether the delay violated due process will often depend on the strength of the prosecution's case. [Citation.]  If the evidence of the defendant's guilt is strong, the likelihood of consequential prejudice from the precharging delay is reduced and a longer delay will be tolerated, but if the evidence against the defendant is weak, the claimed prejudice will take on added significance and enhance the probability of an unfair trial."  (*People v. Booth*, *supra*, 3 Cal.App.5th at p. 1310.)  " 'We

review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation].' " (*People v. Jones* (2013) 57 Cal.4th 899, 922.)

B. *Prejudice*

In denying Cauble's motion before trial, the trial court reasoned in part that while there were lost potential witnesses, "the significance or the substance of any of [those witnesses'] testimony is speculative as to whether or not it would be of any benefit at all to Mr. Cauble." This conclusion was not an abuse of discretion. The import of the taxi employee witnesses was simply that C.W. had appeared in the early morning hours at the cab station to pay his lease with a $100 bill, and related in an idiomatic and mischievous way that he had a person waiting for him at his house. The statements are as consistent with Cauble being awake and voluntarily waiting for C.W. as any other scenario. And investigators found no drugs of any kind in C.W.'s apartment. The inferences that Cauble suggests a jury may draw from these employee statements and that of C.W.'s former roommate—that C.W. took the bill from Cauble's wallet and Cauble had to be drugged and unconscious because C.W. would not otherwise leave a stranger in his house—are too tenuous to nonspeculatively or reasonably follow from this evidence. In short, the trial court's finding was not "beyond the bounds of reason." (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.) Given the nature of the witness statements, we agree Cauble has not shown actual prejudice due to their absence. (Accord, *People v. Cowan* (2010) 50 Cal.4th 401, 431.)

This distinguishes the circumstances here from those in *People v. Booth*, *supra*, 3 Cal.App.5th 1284, on which Cauble relies. In *Booth*, the defendant lost a "potentially powerful witness"—an eyewitness to a

24

shooting—who told police the defendant was not among the group of men who carried it out. (*Id*. at p. 1305.) Because the witness "had the potential to be a blockbuster witness for the defense," the defendant was "substantially and materially prejudiced" by his absence at trial. (*Id*. at p. 1308.) Such is not the case here. None of the aforementioned witnesses were eyewitnesses to C.W.'s actual killing; they merely recounted what they observed about C.W. on the morning of his death, or in King's case, offered an opinion about C.W.'s preferences concerning strangers at his house. *Booth* does not compel us to reach a different conclusion.

## C.  *Justification for the Delay and Balancing*

Even if we were to agree Cauble demonstrated some measure of prejudice from the passage of time due to the lost witnesses, we would conclude the trial court did not abuse its discretion when it found "there was strong justification" for the delay. Cauble's counsel conceded below there was no showing the delay was designed to create a tactical advantage; Cauble does not contend on appeal that the delay in this case was purposeful, and there is no evidence to support such a conclusion. Rather, Cauble argues the delay was unreasonable in view of the napkin with his handwritten information found in 1979 at the scene as well as the discovery of Cauble's fingerprints on items and DNA in C.W.'s mouth and on his penis, which investigators possessed in 2011 when they re-interviewed Cauble in Colorado. Cauble asserts no new evidence was collected between 2011 and 2017, but in 2015, Davidson, who Cauble describes as the "single most important witness" to his defense, had died. Cauble argues we should increase scrutiny when law enforcement puts an ongoing investigation on the " ' "back burner" ' " hoping it would someday become more prosecutable.

25

Here, the People presented ample evidence permitting the trial court to reasonably find substantial investigatory justification for the delay. The evidence showed that technology in 1979 prevented the easy identification of the 174 fingerprints found at the scene. The napkin with Cauble's name was found along with numerous other pieces of paper with names and addresses, and did not by itself point to Cauble as the murder suspect. Further, investigators pursued other suspects, including Guizar, seen running from the scene on the day of C.W.'s murder, and who later had been charged and convicted of an unrelated murder. "[J]ustification for the delay is strong when there is 'investigative delay, nothing else.' " (*People v. Cowan*, *supra*, 50 Cal.4th at p. 431.) Though Cauble's fingerprints were finally identified in 2009 and DNA from C.W.'s penile and buccal swabs pointed to Cauble making him in the court's view a "good suspect," that evidence pointed to Cauble and C.W. engaging in sex, which was unremarkable in view of one witness's statement to police that C.W. had many overnight male visitors. In the face of Cauble's denials in 2011 that he knew C.W. or was at the scene, the People held off charging him with murder until they were able to obtain Cauble's admission during the jail operation. The trial court ultimately

found in denying the motion that the People were justified in waiting until they could obtain evidence actually connecting Cauble to C.W.'s killing.[8]

This finding was not an abuse of discretion. "Sometimes a crime simply is not solved immediately but must await some break in the case . . . ." (*People v. Cordova, supra*, 62 Cal.4th at p. 120.) "The decision when to proceed with a prosecution is exclusively one for the executive branch of government. It can be a complex question and prosecutors have great discretion in deciding when and if to proceed." (*People v. Boysen* (2007) 165 Cal.App.4th 761, 774.) "A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges. 'The due process clause does not permit courts to abort criminal

---

[8] The court explained: "In April 2009, the lab requested to have Mr. Cauble's DNA compared to the glasses and the swabs, also to have the knife checked for prints and DNA. In May of 2009, the defendant's DNA is included on the sperm fraction on the victim's penile and mouth swabs. The DNA on the handle of the knife was insufficient, and the defendant was excluded from the bloodstain on the knife blade. [¶] So now we have Mr. Cauble with some fingerprints and DNA in [C.W.'s] apartment presumably near the time of the homicide, but more than one person certainly could have been in [C.W.'s] apartment. He's a good suspect, and they have somebody that they're focusing in on. [¶] But at least in Mr. Tefft's mind, I think in the minds of the District Attorney, they didn't have enough, not to prosecute somebody for a murder, not to prosecute somebody for a first degree murder or murder with potential special circumstances." The court went on to point out there were numerous unaccounted for fingerprints in December of 2009 with matches for persons who were not excluded as suspects; Cauble's DNA was not found in 2011 tests of the bedspread, blanket, pillowcases, or dried blood scrapings from a night table; and Cauble continued to deny everything, claiming he might have been drugged but having no memory of that. The court stated that as of 2018, police were "convinced that they have the right suspect but they cannot tie him to the actual murder or they don't know what the circumstances of the killing are." It pointed out that it was not until the jail operation that Cauble admitted to stabbing the victim to the undercover officer and later in the jail call to his wife.

prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt . . . .' " (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1256.) "It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or done things a bit differently they would have solved the case sooner." (*Id.* at pp. 1256-1257.)

We hold the trial court did not err by concluding People's justification for the delay—the absence of evidence permitting a jury to find guilt beyond a reasonable doubt until Cauble's jail admissions—well outweighed any minimal showing of prejudice Cauble made such that Cauble was not deprived of due process or a fair trial. Unlike *People v. Booth*, *supra*, 3 Cal.App.5th 1284, where the case against the defendant was not strong (*id.* at p. 1310), here, Cauble admitted to killing C.W.; the question was whether he acted in self-defense or under circumstances that would allow a conviction for a lesser offense such as voluntary manslaughter. Though the jury acquitted C.W. of first degree murder and convicted him of second degree murder, that circumstance in our view—particularly in view of the substantial justification for the delay—does not tip the scales toward the probability of an unfair trial and due process violation on precharging delay grounds. In sum, " '[b]alancing the prejudice [Cauble] has demonstrated against the strong justification for the delay, we find no due process violation.' " (*People v. Cordova*, *supra*, 62 Cal.4th at p. 120.)

## II. *Motion for New Trial Based On Claim of Prejudicially Ineffective Assistance of Counsel*

Cauble contends the trial court erred by denying his motion for new trial based on his defense counsel's constitutionally deficient trial representation following counsel's wife's placement into hospice care and death in December 2018. According to Cauble, counsel was ineffective in three ways: (1) he forgot to call a critical forensic expert or have her present in court during the People's case in chief; (2) he failed to fulfill a critical promise he made during his opening statement, namely that Cauble would testify about what happened on the night in question; and (3) he failed to challenge assertedly improper and prejudicial lay opinions elicited from prosecution witnesses Tefft, Cornacchia and Oplinger. According to Cauble, given the weaknesses in the People's case and its closeness as evidenced by the jury's notes and second degree murder verdict, his counsel's errors likely changed the outcome of the case.

### A. *Legal Principles*

"[A] defendant may raise the issue of counsel's ineffectiveness as a basis for a new trial, and, to expedite justice, a trial court should rule '[i]f the court is able to determine the effectiveness issue on such motion.' [Citation.] To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses

29

counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *People v. Carrasco* (2014) 59 Cal.4th 924, 981.)  We do not second guess trial counsel's reasonable tactical decisions.  (*People v. Woodruff*  (2018) 5 Cal.5th 697, 762.)

Though denial of a motion for new trial is ordinarily reviewed for abuse of discretion, when the motion is based on the allegation of ineffective assistance of counsel, we apply a different standard:  "Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review."  (*In re Gay* (2020) 8 Cal.5th 1059, 1073; accord, *People v. Hamilton* (2009) 45 Cal.4th 863, 923 ["The determination of whether a defendant received ineffective assistance of counsel is a legal one made by a reviewing court, not a factual one entrusted to a finder of fact"]; *People v. Rodriguez* (2019) 38 Cal.App.5th 971, 977; *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76.)

B.  *Counsel's Failures Regarding Expert DiMeo*

In support of his new trial motion, Cauble presented evidence that his counsel had retained a forensic expert, Lisa Allyn DiMeo, to review physical evidence from the scene including C.W.'s bedding but that his counsel never

called her as a witness though she was prepared for and appeared for trial.[9]
Cauble submitted DiMeo's declaration. In it, DiMeo acknowledged the
People's theory that C.W. was stabbed while sleeping, but observed he was
lying on his right side and stated that based on her review, C.W. could not
have been on his right side when he sustained the neck wound and other
injuries on the right side of his body. Her review of bloodstains were
"indicative of movement and [C.W.] being in different locations on the bed
while bleeding." Further, DiMeo observed none of the investigative reports
documented the orientation or relationship of the sheets and blanket; her
personal examination of the bedding revealed "no relationship between
locations and positions of the defects to indicate they were created
simultaneously." Using a digital microscope to inspect the cuts, she verified
there was no blood associated with any of the defects, which would be present
if C.W. were stabbed through the bedding. DiMeo also expressed her view
that "[i]t is impossible to determine through bloodstain pattern analysis
whether blood deposited at a scene is from a self- inflicted injury of the

[9]     DiMeo averred in part: "[Defense counsel] requested I be in court on
the morning of January 22, 2019. I believed this was to observe the
testimony of key State witnesses. The jury and counsel emerged from the
courtroom for the noon break. [Defense counsel] approached me and said,
'[Y]ou're on next.' I was shocked that [he] failed to request my presence
during the case in chief. I had no idea what had been stated by the witnesses
and the scenarios that they had alleged with regard to the physical evidence.
[Defense counsel] said the State rested on a high note for the Defense, and
decided it would be best to not call me as a witness, and not let Mr. Cauble
testify." The People attack the credibility of DiMeo's declaration. They point
out that trial began on January 28, 2019, but even if DiMeo was mistaken on
the dates, before the noon recess on January 31, 2019, defense counsel had
already told the court that he had no other witnesses. We do not see the
discrepancies, which could be clerical in part, as critical to the ineffective
assistance claim.

31

accused" and that the presence of Cauble's blood could possibly be from an initial assault by the victim or injuries Cauble sustained while defending himself. DiMeo averred that had she been present during the testimony of the People's physical evidence witnesses, she would have been prepared to rebut the possible positions of C.W. relevant to his injuries and bloodstains, and relate how the defects in the bedding had no association to those injuries.

Cauble contends his counsel's compromised state resulted in two key mistakes: First, he failed to exchange DiMeo's report on the bedding with the prosecutor, and second, he neglected to prepare DiMeo for trial by permitting her to sit in on the prosecutor's case in chief. Cauble maintains his counsel's failure to present DiMeo's exculpatory testimony—which counsel possessed before trial—was deficient and prejudicial, as it "stripped [him] of the only rebuttal to the prosecution's skewed presentation of the physical evidence." In reply, Cauble emphasizes the gravamen of his claim is counsel's failure to prepare DiMeo to the point where she was unable to testify and he "effectively forfeited [her] as a witness."

We agree counsel's failure to take the proper steps to present DiMeo as a defense forensic expert cannot be explained as reasonable trial strategy. The reason for counsel's decision not to call her, according to DiMeo, was his perception of the strength of Cauble's jail call with his wife, in which Cauble admitted killing C.W., telling her C.W. lied to him, robbed and raped him. But DiMeo's opinions would have bolstered Cauble's defense apart from Cauble's statements to his wife; they were relevant and probative on how the attack may have occurred as well as Cauble and C.W.'s positioning during it, contradicting Oplinger's testimony and the People's theory that the "only explanation" of the physical evidence was that Cauble stabbed a sleeping and defenseless C.W. through the sheets and blanket covering him. DiMeo would

32

have explained why the jury should reject criminalist Cornacchia's guess that Cauble suffered a self-inflicted wound in his attack on C.W. The absence of DiMeo's opinion permitted the prosecutor to use the cuts in the sheet and blanket to highlight in her closing argument without rebuttal the theory of a sleeping and defenseless C.W. This is not a situation where Cauble relies on speculation or merely surmises the content of DiMeo's testimony, which was summarized in Cauble's new trial motion. (*People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5 [defendant claiming ineffective assistance based on the failure to call an expert witness "must do more than surmise that defense experts *might* have provided more favorable testimony"].)

The People argue counsel's failure to call expert DiMeo could have been a rational decision that her testimony would have hurt Cauble, not helped him. They maintain the jury could have inferred Cauble stabbed C.W. through the neck, cleaned the blade and waited for him to bleed out, then stabbed C.W. an additional 12 times to ensure his death. They also argue her testimony would have permitted the prosecutor to argue Cauble attempted to stab C.W. 20 or more times, making self-defense less likely. We disagree these tenuous theories would have been a reasonable basis to forego DiMeo's testimony. We believe the testimony would have allowed competent counsel to argue the bloodless cuts in the blankets and sheets were evidence of wild and uncontrolled slashing, consistent with Cauble's self-defense theory that he awoke to find himself being assaulted, and killed C.W. in self-defense. The People presented no evidence as to how the knife got into the bedroom, and the jury could just have plausibly concluded C.W. kept a knife there for his protection. As we explain more fully below, counsel's failure, combined with other errors such as the prosecutor's improper introduction of a scientific fact not in evidence, and counsel's unfulfilled promise to the jury

33

that he would present Cauble as a witness in his defense to testify about events discussed below, prejudicially impacted his case.

C. *Counsel's Failure to Move to Exclude or Object to Detective Tefft's Testimony About Young Military Personnel*

Cauble contends his counsel was prejudicially ineffective for neglecting to move before trial to exclude Detective Tefft's testimony concerning young military men who befriend and have sex with gay men, then assault them out of remorse or shame. He points out his counsel was aware in advance of trial of the detective's conclusions, which Tefft had related in a search warrant affidavit produced in discovery.[10] Relying on *People v. Martinez* (1992) 10 Cal.App.4th 1001, involving testimony from a highway patrol officer concerning the operation of automobile theft rings, Cauble maintains such profile evidence can distort the jury's perception of mens rea.

We agree Detective Tefft's testimony about common characteristics of young military men was an improper profile. "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime." (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084.) It "ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226.) Such testimony "compares the defendant's behavior to the pattern or profile and concludes the defendant fits the profile." (*Ibid*.) Profile evidence can be

---

10    Detective Tefft's affidavit read: "I have seen accounts in the media, as well as having investigated cases where gay men frequently pick up young military personnel. Many times the military personnel go along willingly, are duped, or in some cases are seduced. Many times there is extreme remorse after sexual acts occur, and the gay males frequently become victims of violent crimes."

"inherently prejudicial" where it requires the jury to "accept an erroneous starting point in its consideration of the evidence"; namely that "criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal." (*Robbie*, at p. 1085.) But such evidence is not always excluded; it "is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' " (*Prince*, at p. 1226.) The evidence can be " 'insufficiently probative' " where " 'the conduct or matter that fits the profile is as consistent with innocence as guilt.' " (*Ibid.*) And in a close case where the issue of guilty knowledge or intent is dependent on circumstantial evidence, the improper admission of such testimony can be prejudicial. (Accord, *People v. Martinez, supra*, 10 Cal.App.4th at p. 1008.)

The People maintain that the detective's testimony was merely a description of his investigation, in which he related to Cauble a theory of what might have happened between the two men. They also argue counsel's decision not to make a pretrial motion was a rational, tactical one, as testimony that military men are duped would have fit Cauble's narrative that he was lied to and seduced into going home with C.W. The People further argue a pretrial motion would have been futile, as the trial court in denying Cauble a new trial stated its view that the motion would have been "fruitless." The People assert the evidence was relevant and admissible on Cauble's motive, suggesting any prejudicial effect was outweighed by its probative value.

We conclude counsel's failure to seek to exclude or at least object to the detective's improper profile testimony, and later the prosecutor's argument based upon it, cannot be explained by a reasonable tactical purpose or trial strategy. "[T]he clear thrust of the evidence was to establish that [Cauble] 'fit' a certain 'profile.' " (*People v. Martinez, supra*, 10 Cal.App.4th at p. 1006.)

35

The damaging effect of such profile evidence—particularly where the prosecution's case as to why Cauble killed C.W. was entirely circumstantial—is too great to make its admission a reasonable and tactical decision. Even if Detective Tefft's testimony can be accurately characterized as merely recounting his investigation, here, the prosecutor used it as substantive evidence of Cauble's guilt, telling the jury, "That is what happened here." In this way, she linked the characteristics of the young military men to Cauble, and encouraged the jury to infer guilt solely on the fact Cauble engaged in behaviors or exhibited characteristics (being a young military man who befriended and had sex with a gay man but regretted it, all innocent behavior) that matched the profile. (Compare *People v. Prince, supra*, 40 Cal.4th at p. 1226 [rejecting argument that testimony was profile evidence where it did not link the general characteristics to that of the defendant].) This inflammatory profile evidence lacked any meaningful probative value, and its use invited the jury to abdicate its role of assessing the evidence as well as impeded Cauble's ability to mount a defense against such a charge. (Accord, *People v. Robbie, supra*, 92 Cal.App.4th at pp. 1085, 1088 [reliance on profile evidence unfair because "[t]he jury is improperly invited to conclude that, because the defendant manifested some characteristics, he committed a crime," which was "highly prejudicial" to the defendant].) Even if counsel's pretrial motion would have been unsuccessful in the trial court, we are of the view that counsel was ineffective for not objecting to the prosecutor's improper use of it in closing.

Under all of the circumstances and combined with counsel's other errors, admission of this testimony unfairly prejudiced Cauble's case. There was little if any physical evidence suggesting the reason why Cauble stabbed C.W.; the prosecutor's case was built on exceedingly weak inferences from

36

clothing on the floor,[11] fingerprints on glasses and liquor bottles, and the location of C.W.'s body. But the prosecutor's use of Tefft's profile allowed the jury to hinge their decision on Cauble fitting a pattern of behavior of youthful and lonely military men rather than the evidence on the issue of the justification or lack thereof for Cauble's actions. The jury's rejection of the People's first degree murder theory and its focus on the degrees of murder permit us to conclude as a reasonable probability that Cauble would have had a different outcome had counsel performed competently in this regard.

D. *Counsel's Failure to Comply with His Announcement that Cauble Would Testify About Events Surrounding C.W.'s Killing*

As summarized above, defense counsel in his opening statement to the jury made his case for Cauble by emphasizing and describing Cauble's anticipated trial testimony about the night and morning in question, and later, his statements to detectives. He told them Cauble would testify he and C.W. fought, and Cauble stabbed C.W. "in a blackout or a partial blackout as a result of being roofied by [C.W.]." Counsel represented the evidence would show Cauble left with a "very fuzzy memory of what occurred" but that in the end Cauble had reasonable cause to be in fear of his life. He urged the jury to "listen very carefully" to what Cauble had to say. Counsel made Cauble's testimony and credibility the focus of his case, which was that Cauble reasonably acted in self-defense.

Once the prosecutor played the recording of Cauble's telephone call with his wife, however, counsel plainly decided he should advise Cauble differently. Explaining he did not recall seeing the recording but admitting it

---

11    There is no evidence as to the type of clothing found on the floor or whose clothing it was, other than that a pair of pants contained C.W.'s wallet. The sole inference that may be drawn is that the clothing belonged to C.W.

could have been disclosed and produced, he told the court it "chang[ed] the scenario" with respect to whether Cauble should testify.

An unfulfilled opening statement promise about defense evidence does not constitute ineffective assistance of counsel per se. (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.) It can in some circumstances be a reasonable tactical decision. (*People v. Stanley* (2006) 39 Cal.4th 913, 955.) But it can also be a damaging failure sufficient to support a claim of prejudice (see *Mann v. Ryan* (9th Cir. 2016) 828 F.3d 1143, 1154; *Saesee v. McDonald* (9th Cir. 2013) 725 F.3d 1045, 1049-1050; *People v. Corona* (1978) 80 Cal.App.3d 684, 725-726 [deficient representation in part because counsel in opening committed to introducing a variety of evidence, including alibi by the defendant and expert testimony to rebut the prosecution's case but did not, opening the door to the prosecutor's legitimate comments about the failures]), particularly where no intervening circumstance justifies the failure to deliver on the promise. (Accord, *Williams v. Woodford* (E.D.Cal. 2012) 859 F.Supp.2d 1154, 1171-1173 [defense counsel ineffective in promising the jury that "key witnesses"—the defendant and two eyewitnesses—would testify and then failing to fulfill that promise]; *Madigral v. Yates* (C.D.Cal. 2009) 662 F.Supp.2d 1162, 1183-1184 [defense counsel's performance deficient because his decision to renege on the promise that defendant would testify could not be "chalked up" to "unforeseeable events . . . that would warrant . . . changes in previously announced trial strategies" and there was no reasonable explanation to counsel's failure to call his client to the stand]; *United States v. Crawford* (E.D.Cal. 2009) 680 F.Supp.2d 1177, 1197-1197 ["Failure to produce a witness promised in opening statement may constitute ineffective assistance of counsel, if the promise was sufficiently 'specific and dramatic' and the evidence omitted would have been significant. . . . In contrast,

where the promise is more general in nature, and/or where the testimony to be provided would not be significant or was elicited through other means, courts may defer to counsel's reasonable decision to change course"]; *U.S. ex rel. Hampton v. Leibach* (7th Cir. 2003) 347 F.3d 219, 259; *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19, 29 [rejecting claim that counsel's decision was a justified reaction to unfolding events]; *Anderson v. Butler* (1st Cir. 1988) 858 F.2d 16, 17 ["L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening. This would seem particularly so here when the opening was only the day before, and the jurors had been asked on the voir dire as to their acceptance of psychiatric testimony. The promise was dramatic, and the indicated testimony strikingly significant"].)

In *Saesee*, the Ninth Circuit explained why such unfulfilled promises can be so detrimental: "A juror's impression is fragile. It is shaped by his confidence in counsel's integrity. When counsel promises a witness will testify, the juror expects to hear the testimony. If the promised witness never takes the stand, the juror is left to wonder why. The juror will naturally speculate why the witness backed out, and whether the absence of that witness leaves a gaping hole in the defense theory. Having waited vigilantly for the promised testimony, counting on it to verify the defense theory, the juror may resolve his confusion through negative inferences. In addition to doubting the defense theory, the juror may also doubt the credibility of counsel. By failing to present promised testimony, counsel has broken 'a pact between counsel and jury,' in which the juror promises to keep an open mind in return for the counsel's submission of proof. [Citation.] When counsel breaks that pact, he breaks also the jury's trust in the client. Thus, in some cases—particularly cases where the promised witness was key to the defense

39

theory of the case and where the witness's absence goes unexplained—a counsel's broken promise to produce the witness may result in prejudice to the defendant." (*Saesee v. McDonald*, *supra*, 725 F.3d at pp. 1049-1050; see also *Williams v. Woodford*, *supra*, 859 F.Supp.2d at pp. 1171-1173 ["[T]he promise that [the defendant] would testify and speak extensively about the circumstances of the case would have made it nearly impossible for the jurors to put out of their minds the fact that he did not testify. This compromised [the defendant's] right to be presumed innocent and his right to remain silent. Such harm is inherently prejudicial"]; *U.S. ex rel. Hampton v. Leibach*, at p. 259 ["Promising a particular type of testimony creates an expectation in the mind of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility. In no sense does it serve the defendant's interests"].)

We recognize that Ninth Circuit and federal district court cases such as *Ouber* are not binding on us. (*People v. Powell* (2018) 6 Cal.5th 136, 152.) But unlike in *Powell*,[12] these cases are instructive on Cauble's ineffective assistance claim. *U.S. ex rel Hampton v. Leibach*, *supra*, 347 F.3d 219, involved sexual assault and other crimes on concert attendees by a large group of gang members. No physical evidence tied the defendant to the attack; eyewitness testimony was the "linchpin" of the state's case against the defendant. (*Id*. at pp. 249-250.) During his opening statement, defendant

[12]    In *People v. Powell*, *supra*, 6 Cal.5th 136, the defendant in part relying on *Ouber v. Guarino*, *supra*, 293 F.3d 19 claimed *the prosecutor* committed misconduct by making a false promise he would testify. (*Id*. at p. 151.) *Powell* found *Ouber* not binding precedent, but also not on point, as the defendant did not make a claim of ineffective assistance and his counsel did not belatedly change plans, but it was the defendant himself who chose not to testify. (*Id*. at p. 152.)

[Hampton's] counsel told the jury, " 'Mr. Hampton will testify and tell you that he was at the concert. Mr. Hampton will tell you that he saw what happened but was not involved with it.' " (*Id.* at p. 257.) But counsel eventually decided not to call the defendant to the stand because he was worried the jury would think him guilty by association. (*Id.* at p. 258.)

The Court of Appeal agreed counsel's action deprived Hampton of effective assistance: "We may assume, without deciding, that it was reasonable for [counsel] to advise Hampton not to testify and not to present testimony from other witnesses about his lack of gang ties; such decisions are often motivated by strategic considerations that command deference from the judiciary. [Citations.] But [counsel] promised the jury that it would hear from Hampton and that it would also hear evidence that he had no gang involvement, and he reneged on his promises without explaining to the jury why he did so. Turnabouts of this sort may be justified when 'unexpected developments . . . warrant . . . changes in previously announced trial strategies.' [Citations.] However, when the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for 'little is more damaging than to fail to produce important evidence that had been promised in an opening.' [Citations.] The damage can be particularly acute when it is the defendant himself whose testimony fails to materialize: [¶] [']When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made.' " (*U.S. ex rel Hampton v. Leibach, supra,* 347 F.3d at p. 257.) Counsel's "broken promises themselves supplied the jury with reason to believe that there was

41

no evidence contradicting the State's case, and thus to doubt the validity of Hampton's defense." (*Id*. at p. 260.)[13]

In *Ouber v. Guarino*, *supra*, 293 F.3d 19, the court reached a similar conclusion in a case where counsel told the jury in a third retrial the defendant would testify about what happened and that her testimony would be central to the case, but then advised the defendant against it. (*Id*. at p. 27.) The Court of Appeals disagreed that counsel's action was a reasonable strategic choice, as he had "structured the entire defense around the prospect of the petitioner's testimony" which was not forthcoming. (*Id*. at p. 28.) The court found counsel's "delayed reaction . . . sharply reminiscent of the situation in *Anderson v. Butler*[, *supra*, 858 F.2d 16], in which we observed that even 'if it was . . . wise [not to have the witness testify] because of the damaging collateral evidence, it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise.'" (*Id*. at pp. 28-29.) It rejected the claim that counsel's decision was a justified reaction to unfolding events, stating, "[N]othing occurred during the third trial that could have blindsided a reasonably competent attorney or justified a retreat from a promise previously made. . . . [T]he prosecution's case in

---

13    The court further explained the harm: "The jury was [led] to believe that Hampton had a story to tell that was diametrically opposed to that of his accusers; it was told, in essence, that there were two versions of what occurred and that it would have the opportunity to evaluate Hampton's own credibility in choosing between those versions. In the end, however, the jury never heard a second version of what occurred—from Hampton or any other eyewitness; it heard only the State's account of events. And in that context, Hampton's unexplained failure to take the witness stand may well have conveyed to the jury the impression that in fact there was no alternate version of the events that took place, and that the inculpatory testimony of the prosecution's witnesses was essentially correct." (*U.S. ex rel Hampton v. Leibach*, *supra*, 347 F.3d at p. 258.)

chief did not differ significantly at the third trial; and the situation that confronted the attorney when he changed his mind about the [defendant's testimony] was no different from the situation that existed at a comparable stage of the earlier trials." (*Id.* at p. 29.) It concluded that "in the absence of unforeseeable events forcing a change in strategy, the sequence constituted an error in professional judgment." (*Id.* at p. 27.)

Whether a decision to forego promised testimony is constitutionally deficient representation is a fact-based determination that we assess on a case-by-case basis. (*People v. Stanley, supra,* 39 Cal.4th at p. 955.) We also acknowledge that while counsel is responsible for trial tactics, the decision whether to remain silent or testify is for the defendant after consultation with counsel. (*People v. Carter* (2005) 36 Cal.4th 1114, 1198.) Though when questioned Cauble told the court it was his decision to not testify, the record affirmatively shows it was counsel who decided at the close of the People's case that circumstances had changed such that he advised against putting Cauble on the stand. Cauble's jail call with his wife triggered counsel's reaction. But the People played the jail call during the preliminary hearing and it should not have been a surprise to counsel. That counsel neglected to view the video recordings on the drive provided by the prosecutor was not excusable. "Making [promises that Cauble would testify about his actions in self-defense and differing statements to investigators] and then abandoning them for reasons that were apparent at the time the promises were made[] cannot be described as legitimate trial strategy." (*U.S. ex rel. Hampton v. Leibach, supra,* 347 F.3d at p. 259.) Like in the above cases, we cannot say counsel's last minute decision to advise Cauble to forego testifying in this case was a strategic choice or a plausible option. This was not a situation where counsel had no reason to anticipate Cauble changing his mind about

testifying. By the time counsel made his decision, the prosecutor had already presented evidence that Cauble repeatedly and falsely told investigators during his interviews that he did not know C.W. and denied being at C.W.'s apartment, and thus there was no potentially damaging cross-examination or other intervening event that would warrant counsel's decision. (Compare *People v. Burnett*, *supra*, 110 Cal.App.4th at pp. 883-884 [counsel's decision to not call defendant a reasonable tactical decision in light of extensive impeachment evidence that "would only have further antagonized the jurors and the trial court" had defendant testified]; see also *id*. at p. 885 [defense counsel discovered that defendant lied to him, and "[o]nce the trial court ruled that defendant's credibility could be impeached with even more damaging evidence, there was little point in engaging in a credibility duel which could only disadvantage defendant with the trial court"]; *People v. Frye* (1998) 18 Cal.4th 894, 983-984 [where defense counsel during trial "perceived defendant was having difficulty remembering information" he was not constitutionally ineffective despite opening statement promising defendant's testimony].)

There is little more important testimony to self-defense than the defendant's own. Under the circumstances, Cauble's testimony was critical to his claim of self-defense and could have changed the outcome of the case. Cauble was the sole person able to relate his interactions with C.W., his state of mind, C.W.'s actions, and his reaction to C.W.'s conduct or advances, on the night in question. Such detail was lacking from his statements to the undercover officer and his wife in the jail call. Defense counsel emphasized this to the jury in his opening statement, and Cauble's testimony about his perceptions of the need to defend himself, if reasonable, would have been " 'a complete justification' " for his action. (*People v. Beck and Cruz* (2019) 8

44

Cal.5th 548, 648; see also *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744 [summarizing law of self-defense and imperfect self-defense].) The testimony would permit a finding that Cauble actually and reasonably believed he needed to use lethal force to defend himself. (*Sotelo-Urena*, at p.744.) The jury was also instructed with theories of voluntary manslaughter based on sudden quarrel, heat of passion, or imperfect self-defense, all theories turning on Cauble's and C.W.'s exchanges and the subjective existence and objective reasonableness of Cauble's belief in the need to defend. (*Ibid.* [imperfect self-defense applies when the defendant has an actual, but unreasonable, belief in the need for self-defense and only when the defendant fears imminent danger of death or great bodily injury].) Thus, Cauble's testimony would have been powerful evidence on the question of malice, which is absent when a defendant sincerely but unreasonably believes in a need to defend himself from the person he tries to kill, or acts in the heat of a passion resulting from provocation he reasonably attributes to the victim. (*People v. Rios* (2000) 23 Cal.4th 450, 460; *Sotelo-Urena*, at p. 744 [If the jury finds a defendant actually but unreasonably believed he needed to use lethal force, then he lacks the malice required for murder and is guilty only of voluntary manslaughter].) In short, we see no rational tactical purpose for counsel's decision.

We turn to the question of prejudice. This analysis does not entail the application of " 'mechanical rules.' " (*In re Gay*, *supra*, 8 Cal.5th at p. 1087.) Rather, we focus on the " 'fundamental fairness of the proceeding whose result is being challenged,' " asking " 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' " (*Ibid.*) Cauble must demonstrate a

reasonable probability that but for his counsel's deficient performance, the outcome of the proceeding would have been different. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)

Such a reasonable probability has been shown here. The jury trial was not lengthy; counsel made opening statements on a Tuesday morning, and the People rested two days later after the noon recess, a relatively short period of time making it unlikely the jurors forgot the promise. (See *Anderson v. Butler*, *supra*, 858 F.2d at pp. 17, 19 [considering among other things the fact only one day elapsed between the promise and the end of the defendant's case].) The jury's question shows it was focused on the degrees of murder. It then rejected the People's theory of first degree murder, and was left to choose between second degree murder, voluntary manslaughter under various theories, or acquittal for reasonable self-defense. Cauble's subjective belief in the need to defend himself was critical. Jurors were instructed it was the People's burden to prove beyond a reasonable doubt that C.W.'s killing was not justified; that Cauble did not act in self-defense.

And as we have explained, the People's evidence on the reason why Cauble killed C.W. was exceedingly weak. Had Cauble testified he was incapacitated but realized at some point that C.W. had either raped or was attempting to rape him, the jury would have had a viable basis to find Cauble acted in reasonable or unreasonable self-defense or find "provocation" sufficient to support a voluntary manslaughter conviction. (E.g., *People v. Trinh* (2014) 59 Cal.4th 216, 233 ["[T]o reduce murder to manslaughter, provocation must be such as would 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment;" ' " heat of passion defense "must arise from provocation supplied, or reasonably believed to have been

46

supplied, by the victim or victims"]; *People v. Lee* (1999) 20 Cal.4th 47, 59 [same]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 [" 'No specific type of provocation is required, and "the passion aroused need not be anger or rage, but can be any ' " " [v]iolent, intense, high-wrought or enthusiastic emotion' " ' " ' " other than revenge, including fear].)  If counsel had presented Cauble and expert DiMeo to counter the People's case, a lawful conviction of voluntary manslaughter was a realistic possibility.

It is true that the jury here received, and is normally presumed to follow, an instruction to "not consider, for any reason at all, the fact that the defendant did not testify."  But such instruction does not overcome the combined prejudice resulting from counsel's omissions and failure to produce what would have been powerful evidence in support of Cauble's defense. Under all of the circumstances, Cauble has shown confidence in the outcome of his trial has been undermined, and we conclude he has raised a reasonable probability that counsel's unprofessional omissions " 'undermined the proper functioning of the adversarial process . . . .' " (*In re Valdez* (2010) 49 Cal.4th 715, 729.)  We cannot say that the trial can be "relied on as having produced a just result." (*Ibid.*)

### III.  *Claim of Prosecutorial Misconduct*

Cauble contends the prosecutor committed misconduct in closing and rebuttal arguments by referring to a false scientific fact not in evidence when responding to Cauble's claim he was raped while unconscious, namely, that for Cauble's semen to be found in C.W.'s mouth, Cauble had to be "awake and aroused" or that it was physically impossible for a person to be drugged and also ejaculate.  Cauble maintains the misconduct was especially prejudicial where it was essentially undisputed at trial that Cauble had ejaculated into C.W.'s mouth.  Thus, Cauble argues, "any juror who accepted the false

premise that a man must be awake and conscious to ejaculate necessarily would have rejected the defense's contention that Cauble was raped while drugged and unconscious." According to Cauble, the prosecutor's false premise stripped him of his sole defense theory, rendering the misconduct not harmless beyond a reasonable doubt or at a minimum creating a reasonable chance that at least one juror accepted the premise.

The People respond that Cauble forfeited any challenge to the prosecutor's rebuttal remarks by not objecting to them or requesting an admonition. They argue the prosecutor's rebuttal remarks about physical impossibility were not the same as the closing argument statement that Cauble had to be awake (to which Cauble's counsel objected), and thus a second objection would not have been futile, as Cauble maintains. On the merits, the People argue the prosecutor had wide latitude to draw inferences from the evidence and matters of common knowledge; that her remarks in context merely stated her view based on all the evidence—the cigarettes Cauble smoked, the items he touched, his differing accounts to police, and "common knowledge about male physiology"—that Cauble was awake and aroused when he ejaculated. They argue even if erroneous, given the combination of jury instructions about statements of counsel and the strong evidence of Cauble's guilt, it is not reasonably probable a result more favorable to him would have been reached in the absence of the prosecutor's arguments.

We reject the People's forfeiture argument. The prosecutor's remarks in rebuttal regarding the physical impossibility of a man ejaculating while unconscious were not so different from her initial closing statement as to require a continued objection, which given the court's immediate unfavorable ruling would have been futile in any event. (Accord, *People v. Mendoza*

48

(2016) 62 Cal.4th 856, 906 [failure to request admonition to prosecutor's assertion of fact not in evidence excused because the objection was "quickly overruled"].)

It is generally improper for a prosecutor to misstate the evidence presented at trial, assert facts not in evidence, or base argument on facts not in evidence during closing arguments. (*People v. Fayed* (2020) 9 Cal.5th 147, 204; *People v. Mendoza, supra*, 62 Cal.4th at p. 906; *People v. Linton* (2013) 56 Cal.4th 1146, 1205-1207.) "Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[ ] to make the prosecutor [her] own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' [Citations.]" [Citations.] "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." ' [Citation.] We 'view the statements in the context of the argument as a whole.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

We cannot agree with the People that the prosecutor's statements— which were not isolated—were a matter of common knowledge or common experience. Whether it is possible for a man to ejaculate while unconscious or semi-conscious is a scientific fact not within the ambit of a lay person. (Compare, *People v. Young* (2019) 7 Cal.5th 905, 933 [not misconduct to argue victims were "very fearful" before they were shot, as evidence showed they lay face down on the ground with their hands behind their heads with barrel of gun pressed against their heads when shots were fired; victims' fear was a logical inference]; *People v. Caro* (2019) 7 Cal.5th 463, 513 [prosecutor's references to how women react to a difficult relationship or failed marriage

49

was not misconduct as they drew on " ' "common knowledge" 'or ' "common experiences" ' "]; *People v. Mendoza*, *supra*, 62 Cal.4th at p. 908 [not misconduct for prosecutor to make the "commonsense point" that no one who intentionally kills in a domestic setting is in a normal or calm state of mind].) Nor were the remarks a fair comment on or inference from the evidence, which would be within the bounds of permissible comment. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 473.)

" ' "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Young*, *supra*, 7 Cal.5th at pp. 932-933; accord, *People v. Tully* (2012) 54 Cal.4th 952, 1010.) On this record, and in view of defense counsel's failures recounted above, the improper remarks contribute to a circumstance making it reasonably probable a jury would have reached a result more favorable absent the prosecutor's objectionable behavior. (Cal. Const., art. VI, § 13.) The prosecutor's improper remark cut to the heart of the case: Had Cauble been awake and engaged in consensual sex with C.W. who he killed out of regret? Or was Cauble unconscious or semi-conscious, and awoke to find himself being assaulted by C.W.? Even if the court's instructions could cure the prosecutor's impropriety, we remain concerned with the cumulative impact of the errors in this case.

The People suggest the physical evidence is overwhelming in that it is undisputed Cauble stabbed C.W. 12 times and lied about it. But the fact Cauble killed C.W. was not at issue, the disputed issue was the reason for Cauble's action. The physical evidence was not strong on that point; it was limited to Cauble's fingerprints on glasses and cigarettes and clothing on the floor, from which the prosecutor argued the men engaged in an entirely

consensual sexual encounter.  The evidence in support of Cauble's defense was limited to Cauble's statements to the undercover officer and his wife, which did not relate the details of events or fully explain his and C.W.'s specific actions and Cauble's reaction.  And both Detective Tefft's and the prosecutor's improper statements bolstered the People's theory that Cauble consciously engaged in consensual sex then killed a sleeping C.W. out of regret, directly undermining Cauble's story that he awoke or regained enough consciousness to realize C.W. was raping or about to rape him.  The absence of Cauble's testimony about his perceptions and C.W.'s actions that evening or DiMeo's evidence-based opinions rebutting the prosecutor's mere argument that C.W. was asleep covered in bedding while Cauble stabbed him, compels us to reverse the judgment so as to ensure Cauble is afforded due process.

Given our conclusions, we need not address Cauble's remaining arguments.

DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for a new trial.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.